The CITY OF MONTROSE, Colorado, Petitioner-Appellant,

v.

PUBLIC UTILITIES COMMISSION OF the STATE OF COLORADO, and Daniel E. Muse, L. Duane Woodard, Edythe S. Miller, individually and as commissioners thereof, and Rocky Mountain Natural Gas Co., Inc., Respondents-Appellees.

No. 84SA532.

Supreme Court of Colorado, En Banc.

Feb. 23, 1987.

John R. Kappa, City Atty., Montrose, for petitioner-appellant.

Duane Woodard, Atty. Gen., Charles B. Howe, Chief Deputy Atty. Gen., Richard H. Forman, Sol. Gen., Eugene C. Cavaliere, Deputy Atty. Gen., Denver, for respondents-appellees.

LOHR, Justice.

This is an appeal by the City of Montrose from a judgment of the District Court for

Montrose County upholding a decision of the Public Utilities Commission on certiorari review under section 40–6–115, 17 C.R.S. (1984). The Public Utilities Commission (Commission) entered the decision following a hearing concerning revised tariffs filed by Rocky Mountain Natural Gas Company, Inc. (Rocky Mountain) for the purpose of increasing rates and charges for natural gas in its western slope service area. Pursuant to section 40–3–106(4), 17 C.R.S. (1984), enacted in 1981, the Commission had previously directed Rocky Mountain to file revised tariffs containing the provision that any franchise fees paid by Rocky Mountain to a municipality be surcharged only to customers within that municipality rather than being divided among all customers in Rocky Mountain's rate area. The City of Montrose did not challenge Rocky Mountain's rates and charges but objected to this method of surcharging franchise fees and contended in the rate proceeding that the statute on which the surcharge order was based violates several provisions of the Colorado and United States constitutions. On appeal from the Commission's decision, the district court rejected these arguments and sustained the order of the Commission. We agree that the constitutional challenges are not meritorious, and we therefore affirm the judgment of the district court.

I.

"Municipal franchise charges are sums paid to a municipality by utilities such as Rocky Mountain by agreement for the privilege of providing utility service within that municipality and of constructing and maintaining utility lines in streets, alleys and other municipal property." *City of Montrose v. Public Utilities Commission*, 629 P.2d 619, 621 (Colo.1981). Rocky Mountain has a franchise agreement with each municipality that it serves, including the City of Montrose (City). These franchise agreements all extend for terms of twenty to twenty-five years. In each case, the franchise charge to be paid by Rocky Mountain

is either two percent or three percent of the gross receipts from sales within the municipality.

This is not the first time that these parties have been before us regarding the way that Rocky Mountain surcharges the franchise fees back to its customers. Prior to December 1975, Rocky Mountain treated the franchise fees as general operating expenses and included them within the formula used to determine its rates. Therefore, as operating expenses, all customers shared the cost of those charges. Then, in December of 1975, the Commission ordered Rocky Mountain to surcharge the franchise fees solely to customers living within the municipalities imposing the fees. Based on this order, Rocky Mountain surcharged only its customers within the City for the franchise fee negotiated with the City. The City challenged the order of the Commission and the case ultimately came before this court. On February 5, 1979, we announced our opinion in *City of Montrose v. Public Utilities Commission*, 197 Colo. 119, 590 P.2d 502 (1979) (*Montrose I*). In *Montrose I*, we held that the Commission's surcharge order was unjust and discriminatory, and that it was arbitrary and capricious because it was not supported by any evidence in the record. Therefore, pursuant to the standards for judicial review set forth in section 40–6–115(3), 17 C.R.S. (1973),[1] we directed that the surcharge order be set aside.

In April of 1979, the Commission ordered Rocky Mountain to file new tariffs, and directed that those tariffs should provide that municipal franchise fees would be surcharged to all customers and that the surcharges would be set forth on each customer's bill as a separate item. The City objected to this order, contending that the franchise fees should have been charged as operating costs and included in the formula for computing reasonable rates rather than surcharged independently. The City also objected to that part of the Commission's order requiring the surcharge to be set forth as a separate item on each customer's

---

1. Section 40–6–115(3), 17 C.R.S. (1973), is now codified at section 40–6–115(3), 17 C.R.S. (1984).

bill. We ultimately affirmed the decision of the district court rejecting the City's contentions. *City of Montrose v. Public Utilities Commission*, 629 P.2d 619 (Colo. 1981) (*Montrose II*).

While our decision in *Montrose II* was pending, the General Assembly enacted Senate Bill 139, which is codified in relevant part at section 40-3-106(4), 17 C.R.S. (1984). Section 40-3-106(4) provides:

The commission shall order a fixed public utility, except a municipally owned utility, to increase its rates only to its customers in a municipality by adding a surcharge to recover the amount such fixed public utility pays to that municipality as a cost of doing business within that municipality under a franchise or pursuant to a license or occupation tax levied by the municipality, so long as the increase in rates by such fixed public utility is pursuant to a method of surcharge approved by the commission. Occupation tax as used in this subsection (4) does not include the employer and employee tax imposed by a municipality for the privilege of employment within that municipality.[2]

On July 14, 1981, the Commission issued Decision No. C81-1220 directing Rocky Mountain to file amended tariffs providing for surcharge of municipal franchise fees in the manner required by section 40-3-106(4). Three days later, on July 17, 1981, Rocky Mountain filed for a rate increase with the Commission. The City intervened in the proceedings before the Commission, known as Investigation and Suspension Docket No. 1523 (I & S 1523), concerning this requested rate increase.

On September 28, 1981, the hearing examiner entered his Recommended Decision (Decision No. R81-1623) establishing new rates and charges for Rocky Mountain. Decision No. R81-1623, however, omitted any reference as to how municipal franchise fees were to be treated. The City filed exceptions to the hearing officer's recommended decision, asserting that the hearing officer had erred in failing to enter an order concerning the treatment of municipal franchise fees, in failing to order Rocky Mountain to perform a cost of service study on a municipal/nonmunicipal basis and file new tariffs based thereon (*see Montrose I*, 197 Colo. at 123-24, 590 P.2d at 506), in failing to require separate municipal/nonmunicipal rates for each customer class, and in failing to order that municipal franchise fees be surcharged system-wide. The Commission, by Decision No. C81-1840, adopted the findings, conclusions and recommended order of the hearing examiner and denied the exceptions that the City had filed to the hearing examiner's recommended decision. The City filed an Application for Rehearing with the Commission, and the Commission rejected the application on November 24, 1981, in Decision No. C81-1954.

The City sought certiorari review of both Decision No. C81-1840 and Decision No. C81-1954 in the Montrose County Dis-

---

**2.** Section 40-3-106(4) does not define "fixed public utility," nor is that term defined elsewhere in the Colorado Revised Statutes. In section 40-1-103(1)(a), 17 C.R.S. (1984), however, a public utility is defined in relevant part as a

common carrier, pipeline corporation, gas corporation, electrical corporation, telephone corporation, telegraph corporation, water corporation, person, or municipality operating for the purpose of supplying the public for domestic, mechanical, or public uses and every corporation, or person declared by law to be affected with a public interest....

Each of the entities referred to, with the exception of common carriers, would appear to fall under a common sense definition of "fixed" since the service provided by those entities is delivered by means of stationary facilities and equipment. This is not the case with common carriers. Section 40-1-102(3), 17 C.R.S. (1984), defines a common carrier as "every person directly or indirectly affording a means of transportation, or any service or facility in connection therewith, within this state by railroad, motor vehicle, aircraft, or other vehicle whatever by indiscriminately accepting and carrying for compensation passengers or property ... between fixed points or over established routes or otherwise...." Therefore, it appears likely that "fixed public utility," as used in section 40-3-106(4), was intended to refer to all public utilities except common carriers. However, we need not resolve this question definitively for the purpose of this opinion.

trict Court pursuant to section 40–6–115(1), 17 C.R.S. (1984). The district court rejected the numerous challenges to the constitutionality of section 40–3–106(4) advanced by the City and affirmed the decisions of the Commission. Thereafter, the City appealed to this court pursuant to section 40–6–115(5), 17 C.R.S. (1984), raising the same arguments that it presented to the district court. We now turn to the City's arguments.[3]

## II.

### A.

 The City argues that section 40–3–106(4) violates Article XXV of the Colorado Constitution because that statute is an attempt to regulate utility rates, a function delegated to the Commission by Article XXV. We disagree.

Article XXV provides:

In addition to the powers now vested in the General Assembly of the State of Colorado, all power to regulate the facilities, service and rates and charges therefor, including facilities and service and rates and charges therefor within home rule cities and home rule towns, of every corporation, individual, or association of individuals, wheresoever situate or operating within the State of Colorado, whether within or without a home rule city or home rule town, as a public utility, as presently or as may hereafter be defined as a public utility by the laws of the State of Colorado, is hereby vested in

such agency of the State of Colorado as the General Assembly shall by law designate.

Until such time as the General Assembly may otherwise designate, said authority shall be vested in the Public Utilities Commission of the State of Colorado; provided however, nothing herein shall affect the power of municipalities to exercise reasonable police and licensing powers, nor their power to grant franchises; and provided, further, that nothing herein shall be construed to apply to municipally owned utilities.

Although Article XXV grants the Commission broad authority to regulate public utilities in this state, that authority is subject to restrictions that may be imposed by the legislature. *Montrose II*, 629 P.2d at 622; *Peoples Natural Gas v. Public Utilities Commission*, 626 P.2d 159, 161–62 (Colo.1981); *Mountain States Legal Foundation v. Public Utilities Commission*, 197 Colo. 56, 59, 590 P.2d 495, 497 (1979). In *Peoples Natural Gas*, we said, "Under [Article XXV], the authority of the Public Utilities Commission has been made subject to restrictions which may be imposed by the General Assembly.... Once the legislature acts, the scope of the commission's authority and procedure is necessarily controlled by statute." 626 P.2d at 161 (citation omitted). Thus, we made it clear that the legislature may restrict the Commission's discretion in matters of rate making.

**3.** The district court agreed with the Commission's finding in Decision No. C81–1840 that municipal franchise fee surcharges were not in issue in I & S 1523, but nevertheless ruled on the City's claims. The Commission argues that the issue of the constitutionality of section 40–3–106(4) is not properly before this court because the decisions that the City appealed from, Decision Nos. C81–1840 and C81–1954, did not treat the issue of how Rocky Mountain was to surcharge its customers for the franchise fees. We are satisfied, however, that the issue of municipal versus system-wide surcharging was before the Commission in I & S 1523 and is therefore properly before us.

As Decision No. C81–1220 issued by the Commission made clear, Rocky Mountain was required to comply with section 40–3–106(4).

This order applied to the tariffs filed by Rocky Mountain in I & S 1523, and the rates ultimately approved by the Commission in Decision No. C81–1840 were subject to that statute by operation of law and by way of the Commission's Decision No. C81–1220. Furthermore, the City raised the issue in its exceptions filed to the hearing officer's recommended decision. In rejecting the exceptions filed by the City, the Commission noted, in Decision No. C81–1840, "[A]t the present time this Commission lawfully cannot decline to implement [section 40–3–106(4) ]." Moreover, Rocky Mountain in fact implemented section 40–3–106(4) after I & S 1523 was initiated. We conclude that the issue of the constitutionality of section 40–3–106(4) was raised before the Commission by the City and is properly before this court.

We believe that the statute at issue in the present case, section 40–3–106(4), is such a legislative restriction placed on the discretion of the Commission. Section 40–3–106(4) does nothing more than restrict the manner in which the Commission may exercise its discretion to order privately owned fixed public utilities to surcharge the costs of franchise fees back to the utilities' customers. Accordingly, section 40–3–106(4) does not violate Article XXV of the Colorado Constitution.

### B.

■ The City argues next that section 40–3–106(4) interferes with the right of home rule cities, such as Montrose, to grant franchises. Article XX, Sections 4 and 6,[4] and Article XXV of the Colorado Constitution expressly preserve the right of home rule cities to grant franchises relating to streets, alleys, or public places. *See Community Tele-Communications, Inc. v. Heather Corp.*, 677 P.2d 330, 336 (Colo.1984). However, we are unable to see how section 40–3–106(4) interferes with the City's right to grant franchises. As the district court pointed out, the City is still free to negotiate and grant franchises and to collect franchise fees. Section 40–3–106(4) does not limit a home rule city's discretion to exercise these functions. Likewise, section 40–3–106(4) in no way alters, restricts or abolishes a privately owned fixed public utility's obligation to pay to a municipality with which the utility

has a franchise agreement the entire amount of the franchise fee negotiated. Indeed, the City admits that the amount of franchise fees to be paid by utilities to municipalities is unaffected by section 40–3–106(4).

■ The City contends, however, that by transferring the liability for franchise fees to municipal customers alone, section 40–3–106(4) has effectively eliminated the consideration that a municipality receives in return for granting a franchise and that the franchise fee is thereby converted into the functional equivalent of a sales tax on municipal customers. This, in the City's view, adversely affects its power to grant franchises. With this we cannot agree.

As the Commission correctly points out, there is nothing in the power to grant franchises that immunizes customers within a municipality charging a franchise fee from paying an increment to cover this cost as a part of their rates for service. In *State ex rel. City of West Plains v. Public Service Commission*, 310 S.W.2d 925 (Mo. 1958), the Missouri Supreme Court was faced with a challenge similar to that presented by the City in the present case. In that case, Missouri's Public Service Commission had authorized a telephone company to pass on the cost of occupation taxes imposed by a municipality solely to the subscribers within the municipality imposing the tax. The City of West Plains contended that this order interfered with

---

**4.** Article XX, Section 4, provides in relevant part:

No franchise relating to any street, alley or public place of the said city and county shall be granted except upon the vote of the qualified taxpaying electors, and the question of its being granted shall be submitted to such vote upon deposit with the treasurer of the expense (to be determined by said treasurer) of such submission by the applicant for said franchise.

Originally, Article XX, Section 4, applied only to the City and County of Denver. Article XX, Section 6, however, made the provisions of Article XX, Section 4, applicable to all home rule cities and towns. Article XX, Section 6, provides in relevant part:

The people of each city or town of this state, having a population of two thousand inhabitants as determined by the last preceding census taken under the authority of the United States, the state of Colorado or said city or town, are hereby vested with, and they shall always have, power to make, amend, add to or replace the charter of said city or town, which shall be its organic law and extend to all its local and municipal matters.

. . . . .

From and after the certifying to and filing with the secretary of state of a charter framed and approved in reasonable conformity with the provisions of this article, such city or town, and the citizens thereof, shall have the powers set out in sections 1, 4 and 5 of this article....

. . . .

its authority under the Missouri Constitution to impose such taxes. In rejecting this argument, the Missouri Supreme Court concluded:

> The argument is that [West Plains], pursuant to constitutional authority, levied an occupation tax against [the telephone company] but that the commission, by its order, has converted the tax into one against the subscribers to the telephone service. The conclusion is fallacious. The utility remains the party taxed and the utility still pays the tax—the only effect of the commission's order in that respect is to permit the utility to collect the money with which to pay the tax from the tax beneficiaries rather than from all subscribers. It must be apparent that a utility's subscribers will always provide the money for payment of all taxes—the utility has no other source of revenue—the only question is which subscribers should pay the tax. Under the commission's order, [the telephone company] receives no more money and no higher rate of return than it would receive under its prior practice of collecting occupation taxes system-wide.

*Id.* at 934. *See also City of Spartanburg v. Public Service Commission,* 281 S.C. 223, 314 S.E.2d 599, 600 (1984); *Ogden City v. Public Service Commission,* 123 Utah 437, 260 P.2d 751, 753–54 (1953).

This reasoning applies with equal force to the facts of the present case. Were we to accept the City's argument, it would follow that municipal residents should not have to pay any part of the cost of franchise fees imposed by the municipality. Such a result is not required by Article XX, Sections 4 and 6, or Article XXV of the Colorado Constitution. We therefore conclude that section 40–3–106(4) does not interfere with the right to grant franchises guaranteed to home rule cities by the Colorado Constitution.

## C.

Relying on our opinion in *Montrose I,* the City contends that section 40–3–106(4) violates the equal protection of the laws as guaranteed by the United States and Colorado constitutions because it treats municipal and nonmunicipal ratepayers differently in the absence of a rational basis to do so. The City's reliance on *Montrose I* is misplaced.

In *Montrose I* we held, among other things, that the *Commission's* order requiring fixed public utilities to surcharge municipal franchise fees to customers living within the municipalities imposing the franchise fees violated the *statutory* requirement that decisions of the Commission are to be "just and reasonable." *See* § 40–6–115(3), 17 C.R.S. (1984); *Montrose I,* 197 Colo. at 122–23, 590 P.2d at 504–05. Section 40–6–115(3), 17 C.R.S. (1984), provides in pertinent part:

> The review [of a decision of the Commission] shall not extend further than to determine whether the commission has regularly pursued its authority, including a determination of whether the decision under review violates any right of the petitioner under the constitution of the United States or of the State of Colorado, *and whether the decision of the commission is just and reasonable* and whether its conclusions are in accordance with the evidence.

(Emphasis added.)

The City argues that our decision in *Montrose I* requires us to hold that section 40–3–106(4) violates the equal protection of the laws since we found that the decision of the Commission under review in *Montrose I,* which ordered Rocky Mountain to do what section 40–3–106(4) now requires Rocky Mountain to do, was unjust and discriminated against municipal ratepayers to the unfair benefit of ratepayers living outside municipal boundaries. By its terms, however, section 40–6–115(3) requires more of a Commission decision in the way of justness and reasonableness among various classes of ratepayers than do the equal protection clauses of the United States and Colorado constitutions. To read the statute as requiring only that a decision of the Commission meet constitutional equal protection criteria would render the "just and

reasonable" clause of little value. However, each clause of a statute must be presumed to have a purpose, *see Colorado State Civil Service Employees Ass'n v. Love,* 167 Colo. 436, 450, 448 P.2d 624, 630 (1968), and, when possible, every clause of a particular statute will be given effect so as not to render any part of the statute meaningless, *Colorado General Assembly v. Lamm,* 700 P.2d 508, 517 (Colo.1985). The language of section 40–6–115(3) plainly specifies that the rates set by the Commission be just and reasonable, not simply that they do not discriminate among classes in a way that would violate minimum constitutional equal protection requirements. *See also* §§ 40–3–101 (requiring that all charges and service of a public utility be "just and reasonable"), –102 (granting authority to the Commission "to prevent unjust discriminations" by public utilities in rates and charges), and –111 (authorizing Commission, after a hearing, to change rates or other charges set if those rates and charges are "unjust, unreasonable, discriminatory, or preferential, or in any way violate any provision of law"), 17 C.R.S. (1984). Therefore, our decision in *Montrose I* is not dispositive of the City's equal protection claim, and that claim must be analyzed under settled equal protection principles.

■ Equal protection of the laws is guaranteed to all persons by the fourteenth amendment to the United States Constitution and the due process clause of Article II, Section 25, of the Colorado Constitution. *See Millis v. Board of County Commissioners,* 626 P.2d 652, 657 (Colo.1981). A regulatory classification that neither impinges on fundamental rights nor affects suspect classes does not deny equal protection of the laws if the distinctions made have a reasonable basis and are rationally related to a legitimate state interest. *Collopy v. Wildlife Commission,* 625 P.2d 994, 1002 (Colo.1981). The City concedes that the rational basis test is applicable here. Under rational basis analysis, the

City, as the party asserting the unconstitutionality of section 40–3–106(4), has the burden of proving that the statute is constitutionally invalid beyond a reasonable doubt. *Branson v. City & County of Denver,* 707 P.2d 338, 340 (Colo.1985). We conclude that the City has not carried its burden of proof.

■ The legislature could have reasonably concluded that section 40–3–106(4) would reduce the incentive of municipalities to negotiate inflated franchise fees. If such fees are surcharged system-wide by the utility, a municipality knows that its citizens will not have to pay the entire cost of any fee the municipality is able to negotiate. Municipalities could therefore drive up the cost of utility service of all consumers within the system even though residents of the municipality would receive the majority of the benefits of the franchise fee. The higher the franchise fee, the greater the amount of funds that flow into the municipality's general fund. There is the possibility, therefore, that a municipality could place an increasingly greater burden on customers outside its boundaries to support the municipality. Section 40–3–106(4), however, provides a disincentive for municipalities to negotiate inflated franchise fees since whatever fee a municipality is able to obtain from a utility will be paid for, in the end, by the municipality's own residents. *See Ogden City v. Public Service Commission,* 123 Utah 437, 260 P.2d 751, 752–53 (1953); *City of Newport News v. Chesapeake & Potomac Telephone Co.,* 198 Va. 645, 96 S.E.2d 145, 148–49 (1957). This increases the pressure on city officials to negotiate reasonable franchise fees, for a higher franchise fee is more likely to result in a higher number of objections from municipal residents, to whom the city officials are politically answerable.

■ The legislature could also have reasonably concluded that although customers who do not live in municipalities are bene-

fited to some extent by the franchises, *see Montrose I*, 197 Colo. at 122–23, 590 P.2d at 505, customers who live within municipalities charging franchise fees receive the majority of the benefits of the franchises. The franchise fee most often goes into the general fund of the municipality. The general fund usually covers the cost of fire protection, police protection, parks, streets, and ambulance service, among other things—benefits which are enjoyed to some degree by residents outside the municipality but which are enjoyed primarily by municipal residents. We are persuaded that the legislature could have reasonably concluded that municipal customers receive a great enough share of the benefits of the franchises that they should be required to pay for the costs of the franchise fees. Neither the equal protection clause of the fourteenth amendment to the United States Constitution nor the due process clause of Article II, Section 25, of the Colorado Constitution requires that mathematical symmetry be attained between benefits received and payment for those benefits. *Cf. Colorado Dept. of Social Services v. Board of County Comm'rs*, 697 P.2d 1, 13–15 (Colo.1985); *Friends of Chamber Music v. City & County of Denver*, 696 P.2d 309, 320–22 (Colo.1985).

We conclude that section 40–3–106(4) does not violate the equal protection of the laws.

### D.

The City argues that section 40–3–106(4) constitutes special class legislation, which is prohibited by Article V, Section 25, of the Colorado Constitution.[5] The City argues that section 40–3–106(4) constitutes prohibited special legislation because it requires that some expenses, such as franchise fees and occupation taxes, be charged only to utility customers within a municipality but does not require that other operating expenses be charged in the same manner. Absent a reasonable basis for distinguishing between different types of operating expenses, the City contends that section 40–3–106(4) violates Article V, Section 25. We do not agree.

 Article V, Section 25, of the Colorado Constitution was enacted by the people for the purpose of preventing class legislation—that is, legislation that applies to some classes but not to others without a reasonable basis for distinguishing between them, or legislation that exempts some members of a class from coverage without a reasonable basis for the exemption. Therefore, Article V, Section 25, is concerned with the composition of the group that is covered by a particular piece of legislation, rather than the scope of the subject matter of the legislation. For instance, in *McCarty v. Goldstein*, 151 Colo. 154, 376 P.2d 691 (1962), we upheld a statute of limitations that applied to doctors, chiropractors, osteopaths, chiropodists, midwives, and dentists, but not to other health care professionals such as X-ray technicians, dental hygienists, psychologists and therapists. The statute did not violate Article V, Section 25, because there was a reasonable basis for distinguishing between *who was covered and who was not,* and it was "general and uniform in its operation upon all in like situation." *Id.* at 157–58, 376 P.2d at 692–93.

In *City of Denver v. Bach*, 26 Colo. 530, 58 P. 1089 (1899), we held that a statute that required clothing stores and pawn shops to close on Sundays violated Article V, Section 25. In that case we said:

> It is clear that the ordinance, in so far as it affects dealers in clothing, is directed to a particular class of merchants, and exempts others without any substantial reason back of it why it is made to oper-

---

5. Article V, Section 25, of the Colorado Constitution provides:

 The general assembly shall not pass local or special laws in any of the following enumerated cases, that is to say [a number of specific subjects are listed]. In all other cases, where a general law can be made applicable no special law shall be enacted.

ate only upon them, and not generally upon all dealers in merchandise, or all avocations. It compels them to refrain from doing business on Sunday, and yet allows their neighbors engaged in the sale of articles not mentioned in the ordinance a privilege which they are denied. We conclude, therefore, that the ordinance does not affect all alike, and that a business or occupation which is not liable to interfere with public morality, or tend to create disorder, and over which the city has no special control, cannot be singled out, and made the subject of prohibition on Sunday.

*Id.* at 533–34, 58 P. at 1090.

■ Article V, Section 25, therefore, does not require that the legislature include within a law every item that could be made the subject of such legislation. Rather, Article V, Section 25, prohibits the legislature from exempting classes or members of a class from the coverage of a particular statute without justification. *See Mosko v. Dunbar,* 135 Colo. 172, 179–83, 309 P.2d 581, 585–88 (1957); *Rifle Potato Growers Co-operative Ass'n v. Smith,* 78 Colo. 171, 175–76, 240 P. 937, 939 (1925). A law is not local or special when it is general and uniform in its operation upon all in like situation. *Denver Urban Renewal Authority v. Byrne,* 618 P.2d 1374, 1385 (Colo.1980).

■ Section 40–3–106(4) applies to all privately owned fixed public utilities. For purposes of Article V, Section 25, then, the question is whether the legislature acted reasonably in exempting municipally owned fixed public utilities and privately owned non-fixed public utilities (i.e., transportation utilities) from coverage, rather than whether the legislature acted reasonably in choosing not to include all operating expenses within the coverage of section 40–3–106(4). The City, however, does not con-

tend that the distinction between privately owned fixed public utilities and other public utilities is unreasonable.[6] The City's contentions based on Article V, Section 25, are misconceived.

We reject the City's argument that section 40–3–106(4) violates Article V, Section 25, of the Colorado Constitution.

### E.

■ The City contends that section 40–3–106(4) is void because it delegates to the Commission the power to interfere with the authority of municipalities with respect to franchises in violation of Article V, Section 35, of the Colorado Constitution. This claim is without merit.

Article V, Section 35, provides:

The general assembly shall not delegate to any special commission, private corporation or association, any power to make, supervise or interfere with any municipal improvement, money, property or effects, whether held in trust or otherwise, or to levy taxes or perform any municipal function whatever.

The City argues that section 40–3–106(4) gives the Commission the authority to interfere with the City's constitutional power to grant franchises. However, the City's power to negotiate with and grant franchises to privately owned fixed utilities is unaffected by section 40–3–106(4). That statute merely limits the discretion of the Commission in determining how a privately owned fixed public utility will be allowed to recoup the cost of franchise fees—a matter not within the domain of local self-government. *See Town of Holyoke v. Smith,* 75 Colo. 286, 293, 226 P. 158, 160 (1924) (subjects to which protection of Article V, Section 35, extend are only "such as properly fall within the domain of local self-government"). Municipalities have never had the authority

---

**6.** For instance, municipally owned fixed public utilities do not pay the fees and taxes covered by section 40–3–106(4). Furthermore, the Commission has no authority to control the rates of municipally owned public utilities operated

within municipal boundaries. Colo. Const. art. V, § 35; *City of Loveland v. Public Utilities Commission,* 195 Colo. 298, 301, 580 P.2d 381, 383 (1978).

to determine how franchise fees will be surcharged to a privately owned fixed public utility's customers. That authority rests within the discretion of the Commission, a discretion that has now been restricted by section 40–3–106(4).

The other arguments advanced here by the City are substantially similar to those it made with regard to Article XX, Sections 4 and 6, and Article XXV. Those arguments are discussed and rejected in Part II B of this opinion. They are no more persuasive here. Section 40–3–106(4) does not violate Article V, Section 35, of the Colorado Constitution.

### F.

■ The City next contends that section 40–3–106(4) diminishes the obligation of Rocky Mountain to the City and its residents in violation of Article V, Section 38, of the Colorado Constitution in that it converts the franchise fee into a sales tax upon the City's citizens, thereby effectively diminishing the consideration and value of the franchise fee to the City and its residents. This argument is also without merit.

Article V, Section 38, provides:

No obligation or liability of any person, association, or corporation, held or owned by the state, or any municipal corporation therein, shall ever be exchanged, transferred, remitted, released, or postponed or in any way diminished by the general assembly, nor shall such liability or obligation be extinguished except by payment thereof into the proper treasury. This section shall not prohibit the write-off or release of uncollectible accounts as provided by general law.

Were we to agree with the City's argument, it would follow that residents of a municipality granting a franchise could not be surcharged by the utility paying the franchise fee for any part of the cost of that fee since such a surcharge would diminish the consideration and value of the franchise to residents of the municipality. This result is not intended or required by Article V, Section 38.

The flaw in the City's argument is that it attempts to equate a surcharge with a sales tax. We have previously rejected this argument in Part II B of this opinion. Rocky Mountain's legal obligation to the City is unchanged by section 40–3–106(4), for Rocky Mountain is still legally obligated to pay the City 100% of the franchise fee it agreed to pay and is still obligated to furnish adequate gas service at reasonable rates and charges. That being the case, section 40–3–106(4) does not violate Article V, Section 38, of the Colorado Constitution.

### G.

■ The City's final argument attacking the constitutionality of section 40–3–106(4) is that the statute imposes a new liability upon the City's residents in violation of Article XV, Section 12, of the Colorado Constitution. Article XV, Section 12, provides:

The general assembly shall pass no law for the benefit of a railroad or other corporation, or any individual or association of individuals, retrospective in its operation, or which imposes on the people of any county or municipal subdivision of the state, a new liability in respect to transactions or considerations already past.

The City relies on our decision in *City of Colorado Springs v. State*, 626 P.2d 1122 (Colo.1980), where we held that the Pension Reform Act of 1978 unconstitutionally imposed a "new liability" on the City of Colorado Springs "in respect to transactions or considerations already past" by requiring Colorado Springs to pay unfunded accrued liabilities of the firemen's pension plan. *Id.* at 1127–29. That case, however, is distinguishable from the present one.

In *City of Colorado Springs*, we noted that accrued liabilities for payments to be made from a pension fund to its benefi-

ciaries relate to "transactions or considerations already past" because "[t]hey are based upon work performed by employees in the past and are properly viewed as a form of compensation for that past work." *Id.* at 1128. The Pension Reform Act of 1978 imposed a new liability on Colorado Springs with respect to these accrued liabilities because it required Colorado Springs "to contribute an amount in excess of that which could be collected based on [the amount the city had previously been obligated to pay for those liabilities]." *Id.* at 1129. Colorado Springs had paid the amount statutorily required during the time the liabilities accrued. When the legislature determined that the funds collected for those accrued liabilities would be inadequate to fund them, it attempted to require cities to pay an additional amount to accomplish such funding. Therefore, the Pension Reform Act of 1978 imposed a new liability on cities because it required them to pay an amount in addition to the contributions they had been required by statute to make during the time the liabilities accrued. The cities had paid once and the legislature could not require them thereafter to pay an additional amount for those past obligations.

In the present case, section 40–3–106(4) does not require Rocky Mountain or any other privately owned fixed public utility to surcharge municipal customers for amounts that were previously surcharged to, and already paid by, rural customers for the franchise fees. If section 40–3–106(4) required privately owned fixed public utilities to surcharge municipal customers for amounts previously paid to fixed public utilities by rural customers, we would have little difficulty in striking down the statute. Section 40–3–106(4), however, contains no such requirement. Rocky Mountain's liability for franchise fees to the City was not increased by section 40–3–106(4). Although municipal customers will be surcharged more than they were prior to the enactment of section 40–3–106(4), the increase is not a "new liability" within the

meaning of Article XV, Section 12. We are not persuaded that Article XV, Section 12, creates a vested right in municipal ratepayers to any particular method of allocating franchise fees.

## III.

█ The City urges that if section 40–3–106(4) is found to be constitutional, either the Commission or Rocky Mountain is nevertheless required by our decision in *Montrose I* to undertake a system-wide study breaking down all costs to Rocky Mountain along municipal/nonmunicipal lines and to base its rates on the results of that study. We decline to impose such a requirement on either the Commission or Rocky Mountain.

In *Montrose I*, we held that the Commission could order a utility to surcharge municipal fees solely to municipal residents only if a cost of service study was done "to determine how costs of service for a natural gas utility break down along municipal/non-municipal lines...." *Montrose I*, 197 Colo. at 123, 590 P.2d at 506. Section 40–3–106(4), however, effectively overruled that portion of our holding in *Montrose I* by restricting the discretion of the Commission with regard to how certain municipal fees may be surcharged. As there is no constitutional requirement that franchise fees be charged to all customers or that rates be set with mathematical equality, the legislature acted within its authority in choosing not to require the cost of service study sought by the City. The legislature has spoken on this matter and it is not within the purview of this court to question the legislature's choice of policy.

The judgment of the district court is affirmed.