## No. 25519

The Mountain States Telephone and Telegraph Company, a
Colorado corporation v. The Public Utilities Commission of
the State of Colorado and Henry E. Zarlengo, Howard S.
Bjelland, Edwin R. Lundborg, Commissioners; Colorado
Municipal League; The Secretary of Defense on behalf of the
Department of Defense and all other Executive Agencies of
the United States

(513 P.2d 721)

Decided July 30, 1973.　　　Rehearing denied September 17, 1973.

Akolt, Shepherd, Dick & Rovira, T. M. Ledingham, Stuart S. Gunckel, for plaintiff-appellant.

John P. Moore, Attorney General, John E. Bush, Deputy, John E. Archibald, Assistant, Irvin M. Kent, Assistant, for defendants-appellees, The Public Utilities Commission of the State of Colorado, and Henry E. Zarlengo, Howard S. Bjelland, Edwin R. Lundborg, Commissioners.

John W. Madden III, James L. Treece, Curtis L. Wagner, Jr., Dellon E. Coker, for defendants-appellees, The Secretary of Defense on behalf of the Department of Defense and all other Executive Agencies of the United States.

Kenneth G. Bueche, General Counsel for defendant-appellee, Colorado Municipal League.

Gorsuch, Kirgis, Campbell, Walker and Grover, Howard S. Beck, special counsel for defendant-appellee, Colorado Municipal League.

*En Banc.*

MR. JUSTICE HODGES delivered the opinion of the Court.

On October 1, 1970, Mountain States Telephone and Telegraph Company (Mountain Bell) initiated this rate case when it filed with the Public Utilities Commission (PUC) a revised schedule of rates to produce additional annual gross revenue of $16,096,000. This filing was supplemented on December 11, 1970 when Mountain Bell applied for a larger

rate increase, which, in turn, would bring the additional annual gross revenue up to $29,957,000. Mountain Bell's application, if granted, would result in a 13% return on common equity according to its calculations. The Colorado Municipal League and the Secretary of Defense filed protests against this proposed increase of rates for telephone service in Colorado. The PUC refused to authorize the imposition of the requested higher rate during the pendency of investigation and hearings on the proposed rate increase.

After a series of hearings, during which many witnesses testified and numerous exhibits were introduced, the PUC on March 25, 1971 issued its Decision No. 77230, which authorized a rate increase sufficient to produce $11,189,015 in additional annual revenue. The PUC also estimated in its decision that this rate increase would afford Mountain Bell the opportunity to earn 11.4% return on common equity and an 8.9% return on rate base. One of the PUC Commissioners in a dissenting opinion maintained that no rate increase was warranted.

Mountain Bell forthwith put into effect the authorized rate increase, and also commenced a court action challenging the new rate as being unjust, unreasonable, and therefore unlawful under the provisions of C.R.S. 1963, 115-3-1(1). Mountain Bell's complaint in the district court sought review pursuant to 1969 Perm. Supp., C.R.S. 1963, 115-6-15, which specifies and prescribes the procedures and jurisdiction of the district court in reviewing decisions of the PUC. It was alleged in this complaint that the PUC authorized rates are unconstitutionally insufficient in that they will have the effect of confiscating Mountain Bell's property. Also, incorporated in this complaint were claims in mandamus and for declaratory relief, which claims were dismissed by the trial court. In dismissing these claims, the trial court, in effect, held that judicial review of a PUC decision must be had exclusively in accordance with 1969 Perm. Supp., C.R.S. 1963, 115-6-15, under the facts of this case.

The district court, after reviewing the record, entered its judgment affirming the rates as authorized by PUC Decision

No. 77230. From that judgment, Mountain Bell prosecutes this appeal.

Mountain Bell has initiated subsequent rate cases before the PUC, and rates have since been raised beyond the level authorized in this rate case. We do not however wish to consider the mootness problem thus indicated, but will deal with the issues we believe are of significance in this appeal. We herein affirm the judgment of the trial court.

I.

Mountain Bell challenges the use by the PUC of the historic test period as a basis for rate making.

Costs, revenues, and average investment occurring for telephone service for a 12-month period ending October 31, 1970 is the period which the PUC examined to set rates to be charged after March 25, 1971 when it issued its Decision No. 77230.

It is Mountain Bell's position that particularly during times of inflation and great demand for expansion of service, the use of the historic test period by the PUC is invalid because it can be productive only of rates which are unreasonably low, unfair, and confiscatory.

The record shows and Mountain Bell stresses in its argument that it presented a large reservoir of testimony and documentary evidence of expected costs and expected investment necessary to provide adequate telephone service in 1971. It is claimed that the PUC refused to consider this evidence as determinative of rates, but rather, confined its consideration to the historic test period as the premise for its determination of the rates Mountain Bell could charge for the balance of the year 1971 and after. This refusal is characterized by Mountain Bell as being arbitrary, illegal, and in violation of 1969 Perm. Supp., C.R.S. 1963, 115-6-15(3) because the PUC has not "regularly pursued its authority" in this rate case.

Mountain Bell argues that telephone rates are set for the future, and that the PUC's authority is to prescribe just and reasonable charges for telephone service *to be rendered.* Therefore, costs, revenue and investment as projected in the

period when the rates will be effective should be the guideline for the fixing of these rates. These assertions, according to Mountain Bell find statutory authentication in C.R.S. 1963, 115-3-1(1) as follows:

"All charges made, demanded or received by any public utility, or by any two or more public utilities, for any rate, fare, product or commodity furnished or to be furnished or any *service rendered or to be rendered* shall be just and reasonable. Every unjust and unreasonable charge made, demanded or received for such rate, fare, product or commodity or service is hereby prohibited and declared unlawful." (Emphasis added.)

From the foregoing contentions, Mountain Bell urges that this court should rule that the only procedure available to insure fair and reasonable rates is to use expected costs and investment in 1971 as a basis for the rates to be charged for the balance of 1971 and after. Mountain Bell therefore requests that, as a matter of law, this court declare that the use of the historic test period by the PUC is erroneous, and that the trial court erred in not setting aside the PUC decision and ordering the PUC to authorize and establish telephone rates on the basis of expected costs and required investment to provide services to be rendered in 1971 and after as shown from the evidence presented to the PUC by Mountain Bell.

The historic test year procedure as a basis for rate fixing is used extensively by public utility regulatory agencies. No case of precedential value has been cited nor can we in our research discover any case which invalidates this procedure. Furthermore, we are not persuaded by Mountain Bell's arguments that this method of calculating the level of rates for forthcoming use is inherently unsound. Rather, we are of the view that the use of the most recent test year available is a reliable guideline in fixing rates to be charged for telephone service.

The relationship between costs, investment, and revenue in the historic test year is generally a constant and reliable factor upon which a regulatory agency can make calculations which formulate the basis for fair and reasonable

rates to be charged. These calculations obviously must take into consideration in-period adjustments which involve known changes occurring during the test period which affect the relationship factor. Out-of-period adjustments must be also utilized for the same purpose. An out-of-period adjustment involves a change which has occurred or will occur, or is expected to occur after the close of the test year. An increase in the public utility taxes effective after the test year is a good example of such an adjustment. Wages and salary increases which have been contracted for and which will take effect after the test year must also be analyzed in the process of calculations. Such wage and salary increases may not exceed to any large extent the usual consequent increase in the productivity of the employees. If they do, which is generally the case in periods of uncontrolled inflation, then such out-of-period adjustment must be reckoned with in the rate fixing procedure. These are matters which must of necessity be of substantial concern to a rate fixing regulatory agency of the government when it considers all the evidence and all the factors available to it in a rate case.

The central theme of Mountain Bell's attack upon the PUC authorized rates is that the historic test year procedure is not productive of fair and reasonable rates to be charged in the future. Mountain Bell would have the PUC set rates on the basis of budget estimates or projections which could be expected to be reflective of the actual cost of doing business in a future period when the rates to be fixed will be charged. It is contended that this procedure would insure fairer and more reasonable rates because, during periods of inflation, there is a constant force at work which reduces the rate of return on rate base because the cost of doing business is gradually but constantly rising. The budget estimates or projections would take this force into consideration so that a rate of return awarded would more be apt to reflect the actual rate of return realized in the future period.

We agree that a blind adherence in this rate case to the relationship between costs, revenue and average investment in the historic test period without weighing the factors involved

with proper in-period and out-of-period adjustments would be erroneous. Findings and conclusions of the PUC in its Decision No. 77230 state that it considered a number of in-period adjustments and out-of-period adjustments which were brought to its attention in the evidence presented during the course of the hearings. From our examination of this record, it is obvious that there was no blind adherence to the experiences of the historic test period, or that the PUC refused to consider any of the evidence presented by the Mountain Bell. Certain evidence was rejected by the PUC because it was based solely upon speculation and conjecture in connection with costs of doing business in the future and the rate of return on common equity which would be necessary to attract the equity capital needed for expected expansion.

We therefore reject Mountain Bell's arguments and admonitions directed against the use of the historic test period and we find that Mountain Bell's proposed use of projected costs or budget estimates for the future period would be an unreliable guideline for setting rates to be charged. It would not be in the public interest to fix rates on pure conjecture as to what costs of providing adequate telephone service will be in a forthcoming period. To fix rates in accordance with Mountain Bell's budget estimates or projections as presented by its evidence before the PUC would not only demean the PUC's authority in the legislative field of rate making, but would by its very nature contribute to inflationary pressures.

II.

Mountain Bell argues at length that a rate of return on common equity of less than 13% is unlawful as being in violation of C.R.S. 1963, 115-3-1(1), which statute prohibits unjust and unreasonable public utility charges. As set forth heretofore, the PUC's authorization in this rate case afforded an estimated 11.4% return on common equity.

Essentially, it is Mountain Bell's position that the evidence before the PUC does not support this 11.4% rate of return on common equity. It is conceded, however, that one witness, a staff member of the PUC, testified as to his examination and

analysis of the factors involved in this rate case and on that basis, offered his view that the rate of return on common equity would be adequate if it was computed at 11% and perhaps a little higher. It is Mountain Bell's contention that this evidence should be given no credence by the PUC in the face of the voluminous testimony by a number of witnesses with purportedly greater expertise in the area of public utility rates, all of whom testified in support of Mountain Bell's proposed rate increase. On the question of return on common equity, they testified that anything less than 13% of return would be inadequate, would be insufficient to permit Mountain Bell to attract new equity capital, and would provide a return far short of affording just compensation to the equity owners of Mountain Bell.

Mountain Bell cites numerous cases for the general proposition that public utility rates which are not sufficient to yield a reasonable return on the value of the property used are unjust, unreasonable and confiscatory. Several of the more prominent cases which stand for this well recognized and universally accepted principle are: *Bluefield Water Works & Improvement Co. v. Public Service Comm. of West Virginia,* 262 U.S. 679, 43 S.Ct. 675, 67 L.Ed. 1176 (1923); *United Railway & Electric Co. v. West,* 280 U.S. 234, 50 S.Ct. 123, 74 L.Ed. 390 (1930); and *Los Angeles Gas and Electric Corp. v. Railroad Commission,* 289 U.S. 287, 53 S.Ct. 637, 77 L.Ed. 1180 (1933).

▮ The record in this case reveals that evidence in the form of testimony and exhibits was presented in support of several levels of revenue. As to each level, it was testified that it would provide a fair, just and reasonable rate for telephone service in Colorado. We reject Mountain Bell's suggestion that the evidence in support of the PUC decision was totally insufficient and incompetent. To detail and analyze the evidence presented as to the adequacy of various levels of rates would unduly lengthen this opinion. From our review of this voluminous record, we are fully satisfied, as was the trial court, that there was a clear sufficiency of evidence in support of the PUC decision.

It must also be borne in mind, that the PUC members who weighed all the evidence presented and arrived at a determination, have expertise in the subject matter. This, we believe, is quite vividly reflected in the 44 pages of findings, discussions and conclusions which comprise PUC Decision No. 77230. The evidence presented at the PUC hearings is well analyzed, and based thereon, logical and supported conclusions are reached. In our view, finding of fact No. 20 as follows is an excellent resume and conclusory statement by the PUC on the factors involved in this rate case.

"Of the net operating earnings of $36,079,840 found to be fair, reasonable and necessary in above Finding No. 16, after subtraction of fixed charges as stated in above Finding No. 19, the amount available for the common equity applicable to the Company's Colorado intrastate operations for the 12 months ended October 31, 1970, would be $27,419,191, resulting in a rate of return on common equity of 11.4% which is a fair, just and reasonable return and is sufficient and necessary to cover dividend requirements, to accumulate a reasonable surplus, to enable the Company to maintain its credit and to raise capital on reasonable terms, and to assure the financial integrity of the Company; and such return is commensurate with returns on investments in other enterprises having corresponding risks."

Under the judicial review provisions of 1969 Perm. Supp., C.R.S. 1963, 115-6-15, a court exercises its independent judgment as required by this statute when it makes a determination as to whether the PUC has regularly pursued its authority. This involves the issue of whether or not the PUC decision is supported by adequate evidence and whether its order, particularly when there is disputed evidence, is supported by findings of fact. *Pub. Util. v. Northwest,* 168 Colo. 154, 451 P.2d 266. From our examination of this record, we hold that the PUC regularly pursued its authority in this rate case.

It is of significance here to also observe that rate fixing involves more than finding of facts and applying them. It involves also to a considerable extent many questions of

judgment or discretion on the part of the PUC. Public utility rate making is a legislative matter, and to the PUC, under our statutory scheme, has been delegated this task. It is true, of course, that in pursuing this task, the PUC must have before it evidence on the subject matter, but the determination as to what is a fair, just and reasonable rate is a matter of judgment or discretion. This judgment or discretion on the part of the PUC must be based upon evidentiary facts, calculations, known factors, relationship between known factors, and adjustments which may affect the relationship between known factors. We find there is evidence in the record pertaining to all of these items upon which this judgment or discretion must be grounded. As stated previously, it is our view that the PUC demonstrated a high degree of expertise in this rate case and therefore we have no basis for holding that in this case the PUC's judgment was erroneous or that it abused its discretion either in the methods utilized to calculate the basis for the rates or in the consequent level of rates authorized.

In *Colo. Mun. League v. Pub. Util.,* 172 Colo. 188, 473 P.2d 960, which also involved Mountain Bell rates, the following statement is made which is fully applicable here:

"In this most voluminous record and among the many exhibits is to be found ample, competent evidence to support the Commission in its findings relating to rate of return. The determination of this end result is not an exact science. The Commission, in addition to the consideration of arithemetical figures and algebraic equations, must evaluate the effect of a large number of factors. This evaluation flows as a stream bounded on each side by the limits of discretion. We hold that the Commission in fixing this rate of return stayed within its discretionary channels."

### III.

Mountain Bell's persistent contentions, that any rate of return on common equity of less than 13% is confiscation and therefore unconstitutional, are rejected. It must be emphasized here, that the rate of return involved in public utility rate proceedings is the ratio between net

operating revenues and rate base. That rate of return and that ratio are the criteria for determining what is or is not confiscation.

This is spelled out in many leading cases involving rate fixing. For instance, it is held in *Los Angeles Gas and Electric Corp. v. Railroad Commission,* 289 U.S. 287, 53 S.Ct. 637, 77 L.Ed. 1180 that a public utility is entitled to demand just compensation, which is defined as a fair return upon the reasonable value of its property being used for the public. This value is the rate base upon which a fair return must be predicated. See also *Board of Public Utility Commissioners v. New York Telephone Company,* 271 U.S. 23, 46 S.Ct. 363, 70 L.Ed. 808.

The earnings of the stockholders is not the prime consideration in rate cases. The cost of capital, however, must be given attention as one of the factors in determining what is the appropriate rate of return on rate base. From the record, it is our view, that the PUC gave due consideration to these factors in its authorization providing for a rate increase sufficient to produce $11,189,015 in additional revenue and an 8.9% return on rate base.

It is noteworthy to briefly mention the dissenting opinion of one of the members of the PUC in connection with the claim of confiscation in this case. This dissenting opinion stated that no increase in rates were either warranted or justified in this case on the ground that Mountain Bell's preference for greater equity financing, rather than greater debt financing, has caused the purported need for more revenue, and thus, higher rates. The theory of this dissent is that if required capital was raised by a larger percentage of debt financing over equity financing, the savings in income tax would be substantial and the rate hike authorized by the majority opinion would be unnecessary. It is the dissenting commissioner's view that it is the responsibility of the PUC to require under certain situations that equity financing be restricted in favor of debt financing to raise capital. We do not express any view in this regard except to state that methods of raising capital should be left to the discretion of

management unless there is a substantial showing that rate payers are being prejudiced materially by the managerial options in the area of capital financing.

## IV.

█ Mountain Bell's complaint in the district court contained multiple claims. The first claim for relief was for judicial review as provided by 1969 Perm. Supp., C.R.S. 1963, 115-6-15. The second, third and fourth claims for relief were in mandamus and for declaratory judgment. On motion of appellee, Colorado Municipal League, the second, third and fourth claims for relief were dismissed by the district court. Mountain Bell contends that this was error and to support this contention states in its brief that its purpose in making the second, third and fourth claims for relief was to seek:

"relief from the actual experience resulting from the application of the Commission's rate order."

In other words, it was Mountain Bell's intention to utilize the second, third and fourth claims for relief as vehicles to introduce evidence before the district court which pertained to the effect of the newly authorized rate. This evidence, according to Mountain Bell, would show that the PUC's rate order after it was placed in operation actually did not result in a fair return and was therefore confiscatory.

It is our view in this case that the district court properly dismissed all but the first claim for relief. To have allowed the second, third and fourth claims for relief to be retained for district court consideration would have obviously meant that the district court would have to conduct a *de novo* hearing as to fair and just rates based not only upon evidence presented before the PUC but upon new evidence. In our view, such a judicial review is impermissible.

The new evidence which Mountain Bell would have the district court consider is evidence which may be presented for the first time only to the PUC. It is the type of evidence which could properly be the basis for a renewed rate case before the PUC. As was previously noted in this opinion, Mountain Bell subsequent to the date of the PUC decision

involved here has applied to the PUC for higher rates which have since been sanctioned by the PUC.

By the provisions of 1969 Perm. Supp., C.R.S. 1963, 115-6-15, it is obvious that the legislature intended this to be the exclusive procedure for reviewing orders and decisions of the PUC made after a full hearing and presentation of evidence on the issues before the PUC. The judicial review envisaged by Mountain Bell would have circumvented and rendered nugatory many of the provisions of 1969 Perm. Supp., C.R.S. 1963, 115-6-15 which, among other things, states that:

"No new or additional evidence may be introduced in the district court but the cause shall be heard on the record of the commission as certified by it."

Other situations could be cited where mandamus or declaratory judgment relief could properly be considered by a trial court in PUC cases. However, the situation involved in this case is not one of them.

We believe the following quotation from *Pub. Util. v. Northwest,* 168 Colo. 154, 451 P.2d 266 has applicability:

"The next question is, did the legislature, where a constitutional question is interjected, intend to empower the court to conduct a complete *de novo* investigation of the rates based *upon the record* made before the Commission, or did it intend a different approach? We do not believe that the legislature contemplated that the court, without the aid of a staff and the expertise of the Commission, should undertake to duplicate the evaluation and judgment processes followed by the Commission in arriving at its decision."

Judgment affirmed.

MR. JUSTICE GROVES and MR. JUSTICE ERICKSON do not participate.