POUDRE VALLEY RURAL ELECTRIC ASSOCIATION, INC., a Colorado non-profit corporation, Plaintiff–Appellee,

v.

CITY OF LOVELAND, a Colorado municipal corporation, Defendant–Appellant,

and

United States of America, Department of Agriculture, Rural Electrification Administration; and National Rural Utilities Cooperative Finance Corporation, a District of Columbia corporation, Third–Party Defendants–Appellees.

No. 90SA26.

Supreme Court of Colorado, En Banc.

March 18, 1991.

Rehearing Denied April 15, 1991.

Randolph W. Starr, P.C., Randolph W. Starr, Loveland, for plaintiff-appellee.

Gorsuch, Kirgis, Campbell, Walker and Grover, Paula M. Connelly, Gerald Dahl, Joseph B. Wilson, Denver, Colton W. Babcock, City Atty., City of Loveland, Loveland, for defendant-appellant.

Jessie A. Messenger, Sp. Asst. U.S. Atty., Denver, for third-party defendants-appellees U.S. of America, Dept. of Agriculture, Rural Electrification Admin.

No appearance for third-party defendant-appellee Nat. Rural Utilities Co-op. Finance Corp.

John J. Conway, Denver, for amicus curiae Colorado Rural Elec. Ass'n.

Walker Miller, Julie Coy, Greeley, for amicus curiae United Power, Inc., formerly Union Rural Elec. Ass'n, Inc.

Anderson, Johnson & Gianunzio, Gregory L. Johnson, Mark T. Pifher, M. Cole Emmons, Colorado Springs, for amicus curiae Colorado Ass'n of Mun. Utilities.

Jack P. Wolfe, Longmont, for amicus curiae Mountain View Elec. Ass'n, Inc.

Justice ERICKSON delivered the Opinion of the Court.

This is an appeal of the district court's decision upholding the constitutionality of sections 40–9.5–201 to –207, 17 C.R.S. (1990 Supp.), and awarding compensatory damages to Poudre Valley Rural Electric Association (Poudre Valley). We affirm.

Poudre Valley is a Colorado cooperative electric corporation operating as a public utility under a certificate of public convenience and necessity granted by the Colorado Public Utilities Commission (PUC). The City of Loveland owns and operates an electric utility, and provides electric service to areas abutting Poudre Valley's service territory. Loveland's annexation of property exclusively supplied with electricity by Poudre Valley led to this dispute.

In 1980, Poudre Valley and Loveland entered into an agreement essentially granting Loveland an option to purchase Poudre Valley's facilities and customers within the annexed area. The 1980 agreement provided a mechanism for determining the compensation Poudre Valley would receive if Loveland chose to exercise the option, and excluded certain facilities, including transmission and feeder lines, from the contract terms. Loveland had until January 31, 1987, to annex territory under the agreement.

Before the agreement expired, Loveland exercised its option to annex service areas known collectively as Barnstorm One and Two. The city later annexed a second area known as the East Loveland Industrial Addition. Both of those annexations fell within the terms of the agreement, and Poudre Valley transferred its facilities within the two areas to Loveland. Poudre Valley did not, however, transfer two primary feeder

lines physically located within the East Loveland Industrial Addition, referred to as the North and South Loops, claiming the lines were not included under the agreement. The North Loop ran along Boeing Drive, and the South Loop was located along Earhart Road.

In August 1987, after the contract expired, Loveland annexed the Hach Chemical Addition and the Collins Plating Addition, both of which were primarily served by the South Loop. Because the agreement had expired, those annexations were governed by a Colorado statute enacted in 1986, sections 40–9.5–201 to –207, which generally provides for compensation to a cooperative electric association whose customers are acquired by a municipal electric utility. Loveland agreed to pay for the South Loop facilities, which it acknowledged supplied service to the Hach Chemical and Collins Plating Addition and therefore fell outside the East Loveland Industrial Addition annexation, but refused to pay for the North Loop. According to Loveland, the agreement under which the East Loveland Industrial Addition was annexed excluded from transfer only those primary feeder lines servicing customers outside of the annexed area. Loveland asserted that, ·unlike the South Loop, the North Loop did not serve any existing customers outside the East Loveland Industrial Addition, and therefore compensation was dictated by the agreement rather than the statute. Loveland claimed that since the North Loop was not being used when the East Loveland Industrial Addition was annexed, no further compensation was warranted.

Poudre Valley filed an inverse condemnation action based on the statute, demanding compensation for the North Loop, 25% of the gross revenues for the next ten years received from existing customers within the annexed area, and 5% of the revenues received for the next ten years from all customers acquired after the annexation. Poudre Valley contended that the North Loop provided back-up service to Hach Chemical and Collins Plating, and moreover was excluded from transfer under the 1980 agreement because it was a primary feed line, regardless of whether it served existing customers.

In addition to the arguments regarding the North Loop, Loveland contended that sections 40–9.5–201 to –207 were unconstitutional and thus refused to pay the 25% or 5% surcharges required by the statute. Loveland also argued that, even if constitutional, the payments required were not percentages of gross revenue, as Poudre Valley claimed, but rather excluded "base rate" charges.

The district court rejected Loveland's constitutional arguments, and found that the North Loop, because it was a primary feeder line, was not included in the East Loveland Industrial Addition annexation. The court also found that the revenues referred to in subsections 40–9.5–204(1)(c) and (d) were gross revenues. The court awarded Poudre Valley compensation for the North Loop, 25% of the gross revenues from existing customers for a period of ten years, and 5% of the gross revenues from new customers, also for ten years. The court also awarded interest and costs. We have jurisdiction over Loveland's appeal because it challenges the constitutionality of sections 40–9.5–201 to –207. *See* § 13–4–102, 6A C.R.S. (1987 & 1990 Supp.); *People v. Salazar,* 715 P.2d 1265 (Colo. App.1985).

I

■ Poudre Valley claims that, because Loveland is a statutory city, it does not have standing to challenge the facial constitutionality of a state statute, since political subdivisions of the state lack standing to challenge constitutional provisions directing performance of their duties. *Denver Urban Renewal Auth. v. Byrne,* 618 P.2d 1374, 1379–80 (Colo.1980); *cf. City of Denver v. State of Colo.,* 788 P.2d 764 (Colo. 1990) (home rule cities are not political subdivisions of the state). In this case, however, Loveland is acting as a municipally owned utility under article XXV of the Colorado Constitution, and has satisfied *Wimberly v. Ettenberg,* 194 Colo. 163, 570 P.2d 535 (1977), which requires that a party

must allege an injury in fact to a legally protected interest in order to have standing. The allegation that sections 40–9.5–201 to –207 are unconstitutional directly relates to Loveland's legally protected interest and whether it owes Poudre Valley compensation under those sections of the statute. We hold that Loveland has standing to challenge the facial constitutionality of sections 40–9.5–201 to –207.

■ We also reject Poudre Valley's argument that Loveland is estopped from challenging the statute since it supported adoption of the statute by the legislature. Poudre Valley has failed to prove equitable or collateral estoppel based on Loveland's testimony supporting enactment of the statute.

II

■ Loveland first contends that sections 40–9.5–201 to –207 are unconstitutional because they violate article V, section 35, and article XXV of the Colorado Constitution. Loveland's argument is that the statute requires payment for the takings of rights that are, under the constitution, non-exclusive. According to Loveland, since it has the constitutional right to compete in areas serviced by Poudre Valley, there is no right to compensation if Loveland decides to compete for that service.

Article V, section 35, provides that the General Assembly cannot interfere with or delegate any municipal function. Article XXV vests the public utilities commission with broad powers to regulate all public utilities in Colorado, including home rule cities and other municipalities, "provided however, nothing [ ] shall affect the power of municipalities to exercise reasonable police and licensing powers, nor their power to grant franchises; and provided, further, that nothing [ ] shall be construed to apply to municipally owned utilities."

In *Town of Holyoke v. Smith*, 75 Colo. 286, 296, 226 P. 158, 161 (1924), we declared that article V, section 35, prohibited the PUC from regulating municipal utilities operating within municipal boundaries. *Id.* at 296, 226 P. at 161; *see also City of Lamar v. Town of Wiley*, 80 Colo. 18, 248

P. 1009 (1926) (reaffirming the general rule that the PUC may not regulate municipal utilities servicing their own citizens). In 1954, article XXV was added to the state constitution. Although article XXV granted the PUC significant new authority to regulate public utilities within home rule cities, we have interpreted the last clause of article XXV as merely stating that "there is no intention to give the General Assembly authority to regulate a *municipally* owned utility *within* the corporate limits of the municipality." *City and County of Denver v. Public Utils. Comm'n*, 181 Colo. 38, 46, 507 P.2d 871, 875 (1973). In *City of Loveland v. Public Utilities Commission*, 195 Colo. 298, 580 P.2d 381 (1978), however, we recognized that the PUC could regulate municipally owned public utilities operating outside the municipality's boundaries. *Id.* at 302, 580 P.2d at 383.

■ Finally, in *Union Rural Electric Association, Inc. v. Town of Frederick*, 670 P.2d 4 (Colo.1983), we said that because the PUC could not grant an exclusive certificate of public convenience and necessity to a public utility vis-a-vis a municipally owned utility operating within its city boundaries, the city's decision to compete for new customers within that area did not amount to a compensable taking. *Id.* at 8; *cf. Delmarva Power & Light Co. v. City of Seaford*, 575 A.2d 1089, 1102 (Del.) ("customer choice does not play a decisive role in determining the relative rights of providers of electric service." Municipality committed compensable taking when it provided electric service to customers formerly serviced by public utility.), *cert. denied*, —— U.S. ——, 111 S.Ct. 152, 112 L.Ed.2d 118 (1990). The extent of the property right associated with a certificate of public convenience and necessity granted by the PUC "is not so great that municipally owned utilities, not within the jurisdiction of the PUC, are precluded from providing electric service to new customers within municipal limits." 670 P.2d at 8. The PUC constitutionally has no jurisdiction over municipally owned utilities operating within their municipal boundaries, and hence "cannot

grant a publicly owned utility greater rights than are available under the Colorado Constitution." *Id.* A right to provide exclusive service within those boundaries as against the municipality would be such a grant.

Loveland suggests the rationale of *Frederick* be extended to encompass existing as well as new customers. The city argues that sections 40–9.5–201 to –207 violate article XXV as it was construed in *Frederick* because it mandates compensation when a municipal utility chooses to provide service to customers within its municipal boundaries. The import of *Frederick*, however, is that the municipality cannot be prevented from competing with the public utility for new customers located within its boundaries by being forced to pay compensation. We specifically limited *Frederick* to that question: "Because Frederick is not taking existing customers from Union, we do not decide whether such action would constitute a taking of a property right requiring compensation." *Id.* at 6, n. 1. It does not necessarily follow, then, that *Frederick* mandates the outcome Loveland seeks.

Section 40–9.5–201 is a legislative declaration that article XXV allows the PUC to grant exclusive service territories for public utilities and that it has been the policy of the state "to establish exclusive service territories for cooperative electric associations" such as Poudre Valley, and provides that:

> if a cooperative electric association has been granted an exclusive service territory that is within a municipality that operates an electric utility or within an area annexed by a municipality that operates an electric utility, the municipality has taken private property and shall pay just compensation for the electric distribution facilities and certificate of public convenience and necessity of the association located within the municipality.

Section 40–9.5–204 provides for the method of determining the compensation owed, including present day reproduction costs of the distribution facilities less depreciation, costs for constructing any new facilities necessary to reintegrate the cooperative's system, an annual payment of 25% of the revenues from existing customers for a period of ten years following the annexation, and an annual payment of 5% for the next ten years of the revenues from any new customers. Section 40–9.5–204(2) provides that if the municipality and cooperative cannot agree on the amount owed, either may bring an action for condemnation or inverse condemnation in district court to "determine the amount to be paid pursuant to the [above] factors." [1]

The statute provides that a municipality has taken private property if either the cooperative electric association has been granted an exclusive service territory within a municipality operating an electric utility, or within an area annexed by a municipality operating an electric utility. That provision is ambiguous, however, in that it seems to assume the municipality will provide exclusive service without mandating that it do so. If the municipality has simply annexed territory and is competing for new customers, but is not excluding the cooperative electric association, there is no taking under *Frederick*. Under that scenario, the municipality would not constitutionally owe the cooperative compensation regardless of section 40–9.5–201's provisions.

Here, both parties treated sections 40–9.5–201 to –207 as mandating that the public utility transfer all of its customers and facilities to the municipality once the municipality had given notice of its intent to annex the cooperative's service area. We find nothing in the plain language of the statute indicating such an intent, however, and will "not strain to give language other than its plain meaning, unless the result is absurd." *Colorado Dep't of Social Serv.'s*

---

1. The statute also provides that a cooperative electric association and a municipality may enter into a contract for "buying, selling, or exchanging electric distribution facilities, service rights, and other rights, property, and assets by mutual agreement." § 40–9.5–206(1). The agreement in effect at the time of the East Loveland Industrial Addition annexation fell within that provision and controlled the compensation due Poudre Valley.

*v. Board of County Comm'rs*, 697 P.2d 1, 18 (Colo.1985).

Under sections 40–9.5–201 to –207, Loveland and Poudre Valley could have competed for the same customers in the Hach Chemical and Collins Plating Additions and there would have been no taking so long as Loveland did not condemn any of Poudre Valley's distribution facilities. If the municipality is simply competing with the cooperative for customers in the annexed area, the cooperative has no right to compensation. If the cooperative is excluded, however, from serving its customers in the annexed area, there is a taking and the cooperative is entitled to compensation. *See Frederick*, 670 P.2d at 8. The cooperative has a property right, but the extent of that right is not so great as to prevent a municipally owned utility from competing for customers within its municipal limits. Hence, there is no conflict between sections 40–9.5–201 to –207 and articles V, section 35, or XXV.

### III

Loveland also contends that the statute violates article V, section 25's, prohibition against special legislation, which prohibits that legislature from passing local or special laws that "grant[ ] to any corporation, association or individual any special or exclusive privilege, immunity or franchise whatever. In all other cases, where a general law can be made applicable no special law shall be enacted."

In *Yarbro v. Hilton Hotels Corp.*, 655 P.2d 822, 827 (Colo.1982), we said a statutory classification not involving a fundamental right or suspect class did not violate article V, section 25, so long as it reasonably related to a legitimate state objective. The legislation is presumed valid and will not be disturbed unless the classification is clearly arbitrary and without a reasonable basis. *People v. Trujillo*, 178 Colo. 147, 497 P.2d 1 (1972). Moreover, the burden of showing that the classification is unreasonable rests with Loveland, who asserts that the statute is unconstitutional. *Vogts v. Guerrette*, 142 Colo. 527,

351 P.2d 851 (1960). Loveland has failed to meet that burden.

Loveland argues that if the Poudre Valley was investor-owned, instead of publicly owned, it would not be owed any compensation for service rights or unnecessary facilities. That argument misinterprets the reach of sections 40–9.5–201 to –207. We have already said that, under section 40–9.5–201, Loveland is not required to exclude any utility from an area it has annexed, nor is Loveland required to condemn unnecessary facilities. Loveland has the option of simply competing for customers with the existing utility without paying compensation so long as those customers are within the city boundaries. *Frederick*, 670 P.2d at 8. But, if the city chooses to exclude the utility or condemn distribution facilities, it owes compensation regardless of the status of the annexed utility. *See Public Serv. Co. v. City of Loveland*, 79 Colo. 216, 245 P. 493 (1926).

The statute does distinguish between publicly owned and investor-owned utilities in that it provides a statutory scheme for determining compensation for the former if it is annexed by a municipality, but not for the latter. Loveland has failed to show, however, that there is no rational basis for that classification. Poudre Valley contends that the classification is not unreasonable or arbitrary, and suggests cooperative electric utilities have a different financial status from investor-owned utilities, that cooperatives tend to serve areas around cities, subjecting them to a greater threat of annexation, and that there is a unique federal interest since cooperatives are financed in part by the Rural Electrification Administration, a federal agency. *See Public Utility Dist. No. 1 v. United States*, 417 F.2d 200 (9th Cir.1969). Rather than refute those claims, Loveland merely contends there is no factual basis in the record to support them. That contention does not meet Loveland's burden required when attempting to show that a statute is unconstitutional.

Finally, a statute is not special legislation if "it is general and uniform in its operation upon all in [a] like situation." *City of*

*Montrose v. Public Utils. Comm'n,* 732 P.2d 1181, 1191 (Colo.1987); *see Denver Urban Renewal Auth. v. Byrne,* 618 P.2d at 1385. Section 40–9.5–204 does not only apply to Poudre Valley, but applies to any cooperative annexed by a municipally owned utility.

Thus, section 40–9.5–204 does not violate article V, section 25.

### IV

■ Loveland next argues that the compensation scheme in section 40–9.5–204 is unconstitutional because it violates article II, section 15's, provision that "compensation shall be ascertained by a board of commissioners, of not less than three freeholders, or by a jury, when required by the owner of the property...."

■ Section 40–9.5–204(1) provides that just compensation for service rights and facilities shall be:

(a) The present day reproduction cost, new, of the electric distribution facilities being acquired, less depreciation....

(b) An amount equal to the cost of constructing any necessary facilities to reintegrate the system of the cooperative electric association located outside the municipality or the area annexed by the municipality after detaching the electric distribution facilities to be sold; and

(c) An annual amount, payable each year for a period of ten years following the date of purchase, equal to twenty-five percent of the revenues received by the municipality from the sale of electric power to the services within such municipality which were previously served by the cooperative electric association; and

(d) An annual amount equal to five percent of the revenues received by the municipality from the sale of electric power to the additional services that come into existence in the affected area, for each year for a period of ten years following the date of acquisition.

Section 40–9.5–204(2) allows either party to bring a condemnation or inverse condemnation action in district court to determine the amount of compensation, pursuant to the above factors, if the parties cannot agree on the amount to be paid. Loveland argues that article II, section 15, precludes the General Assembly from enacting a statute such as section 40–9.5–204, which specifically delineates the amount of compensation a condemnee will receive. We disagree.

Loveland had the right to have a jury or board of commissioners decide what compensation Poudre Valley was owed, although it did not invoke that right in this case. Section 40–9.5–204 does not take the factual question of compensation out of the jury's hands, but rather simply provides the guidelines within which a jury must reach its decision. *See Colorado Midland R. Co. v. Jones,* 29 F. 193 (C.C.Colo.1886) ("The legislature may provide under what circumstances and in what manner this compensation shall be determined...."). Such guidelines are not unusual, and article II, section 15, expressly provides that the determination of just compensation by the board or jury shall be "in such manner as may be prescribed by law." *See Montgomery Ward & Co., Inc. v. City of Sterling,* 185 Colo. 238, 523 P.2d 465 (1974) (property must be valued on an undivided basis); *Mack v. Board of County Comm'rs,* 152 Colo. 300, 381 P.2d 987 (1963) (jury may not consider general benefits that incur to residue by reason of improvement); *Ruth v. Dep't of Highways,* 145 Colo. 546, 359 P.2d 1033 (1961) (measure of damages for residential property is fair market value less increased value by reason of improvement); *City of Denver v. Tondall,* 86 Colo. 372, 282 P. 191 (1929) (measure of damages is fair, actual cash value of property condemned, and diminution of value of any untaken property by reason of the taking); *see also* § 43–2–112, 17 C.R.S. (1984) (board of county commissioners shall tender damages as estimated and approved by the board to homeowners whose property is condemned in order to widen roadways. Benefits accruing because of proposed action shall be considered, but shall not exceed damages awarded.). *Cf. Trippe v. Overacker,* 7 Colo. 72, 1 P. 695 (1883) (legislature is powerless to dispense altogether

with the requirement that just compensation be determined by a board or jury).

Colorado has a statutory framework for eminent domain. §§ 38–1–101 to –122, 16A C.R.S. (1984 & 1990 Supp.). Section 13–1–114 provides an express formula for determining compensation. *See also* §§ 38–6–101 to –216, 16A C.R.S. (1984 & 1990 Supp.) (granting cities and towns the right of condemnation in specific instances and providing guidelines for figuring compensation). Juries are also precluded from awarding exemplary damages in condemnation cases. *Ossman v. Mountain States Tel. & Tel. Co.*, 184 Colo. 360, 520 P.2d 738 (1974). Section 40–9.5–204 simply provides the jury with parameters within which it must operate when deciding what compensation is owed.

■ Moreover, although a legislature cannot "direct that anything less than just compensation be made, [it] may require more liberal compensation than that which would satisfy the constitutional requirement." Annotation, *Deduction of Benefits in Determining Compensation or Damages in Eminent Domain*, 145 A.L.R. 17 (1949). *See also Daniels v. State Rd. Dep't*, 170 So.2d 846, 853 (Fl.1964) ("the State, speaking through its Legislature, may of course impose upon itself, and upon those to whom it delegates the right of eminent domain, an obligation to pay more than what the courts might consider a 'just compensation.' "); *Lore v. Board of Pub. Works*, 277 Md. 356, 358, 354 A.2d 812, 814 (1976) ("While these constitutional provisions prevent the State from remitting anything less than 'just compensation,' they do not prohibit the Legislature from deciding to pay more than that minimum."); *Jersey City Redev. Agency v. Kugler*, 58 N.J. 374, 384, 277 A.2d 873, 878 (1971) (legislature "may prescribe a rule of damages more favorable to the landowner than that which would satisfy the minimum requirement of the Constitution.").

For the foregoing reasons, we hold that section 40–9.5–204 does not violate article II, section 15.

### A

■ Section 40–9.5–204(1)(a) provides for compensation for reproduction costs of electric distribution facilities less depreciation. The district court awarded Poudre Valley $37,744.42 plus interest in compensation for the North Loop. The question becomes whether Loveland annexed the North Loop when it annexed the other facilities and customers in the Hach Chemical and Collins Plating Additions.

■ *Frederick* allows Loveland to compete for customers without paying compensation to Poudre Valley, but if Loveland excludes Poudre Valley and annexes the customers and the facilities needed to service those customers, it has committed a taking of Poudre Valley's property and must pay compensation. Moreover, if Poudre Valley is excluded, a compensable taking would occur regardless of the existence of sections 40–9.5–201 to –207. *See* Colo. Const. art. II, § 15 ("Private property shall not be taken or damaged, for public or private use, without just compensation."). Both Poudre Valley's facilities and its right to serve customers under the certificate of public convenience and necessity are property for purposes of the takings clause. Section 40–9.5–201 did not mandate that Loveland exclude Poudre Valley from competing for Hach Chemical's or Collins Plating's electric business, but if Poudre Valley was excluded, it must be compensated.

■ Loveland initially argued that because the North Loop was not serving customers outside the East Loveland Industrial Addition, it was transferred under the 1980 agreement when that addition was annexed. The district court, in our view, properly rejected that argument.[2] Love-

**2.** We affirm the district court's finding that the North Loop was not included in the East Loveland Industrial Addition annexation. Article III of the contract in force at the time of that transfer specifically excluded "transmission lines, feeder lines, substation facilities, regulation and sectionalization equipment, transformers, meters and associated equipment" without regard to whether those facilities presently served customers outside the annexed area or not. In this case, there is no reason to go

land now argues it did not want the North Loop, and is being forced to annex it by section 40–9.5–201. The record of correspondence, however, shows Loveland's position throughout has been that it owned the North Loop by virtue of the East Loveland Industrial Addition annexation and owed no further compensation. Based on an incomplete record on appeal, Loveland made the same argument at trial. There is no evidence to support Loveland's contention that it did not want the North Loop and was being forced to condemn it. Loveland also agreed at trial that the figure provided by Poudre Valley was the correct value of the North Loop.

■ Further, if a municipality annexes an area and excludes the existing cooperative from competing for business, the municipality cannot simply claim it has no present use for a certain facility and therefore not pay compensation for it. If that facility cannot be removed from the annexed area by the cooperative and reused, it has necessarily been condemned by the municipality in the annexation process. Loveland cites *Public Service Co. v. City of Loveland* in support of its argument that it cannot be forced to take facilities it does not want. In *Public Service Co.*, we said "[t]he necessities and requirements of the city, not what the company would like to dispose of, is the determining factor as to what shall be taken." 79 Colo. at 228, 245 P. at 499. We also said, however, that the company was entitled to the value of the property taken, "and also damages, if any, to the property not taken." *Id.* Moreover, the property in dispute in *Public Service Co.* was a substation the company continued to use for customers not serviced by the city. Here, on the other hand, the North Loop cannot be used by Poudre Valley as it extends only into areas annexed by Loveland.[3] Because Loveland annexed the

North Loop as part of the Hach Chemical and Collins Plating annexation, Poudre Valley is entitled to compensation for the North Loop.

B

■ The district court also awarded Poudre Valley 25% of the gross revenues for existing customers, and 5% of the gross revenues for new customers, both for a period of ten years from the date of the transfer. Sections 40–9.5–204(1)(c) and (d) provide for a payment of 25% and 5%, for old and new customers respectively, of the "revenues received by the municipality from the sale of electric power." Loveland argues that the district court misconstrued the meaning of "revenues" as used in those subsections.

Loveland's charge to electric customers is divided into two components. The first, a "base charge" reflecting certain fixed costs, such as meter reading and administration, is charged to each customer but does not vary depending on electric usage. The second component is a "usage charge" covering the costs associated with actually supplying electricity to the customer, which varies depending on each customer's electric usage. The district court found that the "revenues" referred to in subsections 40–9.5–204(1)(c) and (d) included both the base charge and the usage charge. Loveland contends such a reading unfairly benefits Poudre Valley since it no longer has fixed administration costs. Loveland's position is that Poudre Valley should receive a percentage of Loveland's profits, rather than total revenues. Poudre Valley argues that the district court was correct, and neither party cites authority for their position.

Revenue in the context of rate regulation is normally defined as operating costs plus the difference between the gross value of

---

beyond the plain language of the contract to resolve that issue.

The fact that the North Loop was donated to Poudre Valley by a developer is irrelevant under the statute, since section 40–9.5–204(1)(a) calls for present-day reproduction costs for new facilities rather than reimbursement for the original cost of the old, condemned facilities.

**3.** Both Loveland and Poudre Valley construed the statute as prohibiting Poudre Valley from servicing its customer. Loveland, as a result, assumed the obligation of servicing Poudre Valley's customers in the area.

tangible and intangible property and the accrued depreciation for that property (the "rate base") multiplied by the allowed rate of return. C. Phillips, Jr., *The Regulation of Public Utilities,* 168–69 (1988). In Colorado, revenue is not specifically defined in the statutes relating to public utilities, sections 40–1–101 to 40–40–106, 17 C.R.S. (1984 & 1990 Supp.). In one instance, the legislature declares that the PUC "may require a public utility to segregate investments, expenses, *and revenues* associated with utility service ... to ensure that such services are not subsidized by revenues from other utility operations." § 40–3–104.3(2)(a) (emphasis added). That language implies that the legislature defines revenue as separate from operating expenses and administration costs. In another section, however, the legislature states that when determining the amount of fees the utility owes annually to the Department of Revenue, the proper amount on which to base the fees is "the *gross operating revenues* of all public utilities filing returns," which implies a distinction between gross and net revenues. § 40–2–112 (emphasis added).

> We have said that, in setting rates, the PUC must also consider the reasonableness and fairness of rates so far as the public utility is concerned. It must have adequate *revenues* for operating expenses and to cover the capital costs of doing business. The *revenues* must be sufficient to assure confidence in the financial integrity of the enterprise, so as to maintain its credit and to attract capital.

*Public Utils. Comm'n v. District Court,* 186 Colo. 278, 282–83, 527 P.2d 233, 235 (1974) (emphasis added). We have also said that "the rate of return involved in public utility rate proceedings is the ratio between *net operating revenues* and rate base." *Mountain States Tel. & Tel. Co. v. Public Utils. Comm'n,* 182 Colo. 269, 280–81, 513 P.2d 721, 727 (1973) (emphasis added). *See also* Black's Law Dictionary 1185 (5th ed. 1979) (defining revenue as "profit, as that which returns or comes back from an investment" and, as applied to the income of government, "a broad and general

term, including all public monies which the state collects and receives, from whatever source and in whatever manner.").

Common usage of the term "revenues," in the context of public utilities in Colorado, in our view, refers to the total revenue received rather than simply profit. We therefore agree with the district court that the legislature intended section 40–9.5–204(1)(c) and (d) to apply to both the base charge and usage charge received by the municipality.

## V

■ Finally, Loveland argues that it was precluded from making a closing argument to the court, an opportunity Poudre Valley was afforded. After Poudre Valley submitted a closing argument, the district court gave Loveland until October 2, 1989, to submit a written closing argument. The written argument was filed on September 26, 1989. The court's final order is dated September 25, 1989, indicating that the court made its decision without the benefit of Loveland's closing argument.

■ Once the trial court allows one party to submit a summation, it is error not to allow the opposing party the same opportunity. The question is whether that error under the facts in this case amounts to reversible error, which requires us to remand this case back to the trial court for reconsideration.

■ A judgement entered by the trial court will not be reversed for alleged errors unless those errors are shown to prejudice the substantial rights of the complaining party. *Bigler v. Richards,* 151 Colo. 325, 377 P.2d 552 (1963); *Hadden v. Gateway West Publishing Co.,* 130 Colo. 73, 273 P.2d 733 (1954). In addition, a judgment is presumed correct, and it is incumbent upon Loveland to show that the error was prejudicial. *Anderson v. Colorado State Dep't of Personnel,* 756 P.2d 969 (Colo.1988); *Cole v. Kyle,* 141 Colo. 492, 348 P.2d 960 (1960). The record amply supports the trial court's judgment, and the arguments made in Loveland's written closing summation are essentially those made

in its opening statement and in presentations during the course of the trial. Loveland has failed to show reversible error under the facts of this case.

Accordingly, we affirm the judgment of the district court awarding damages to Poudre Valley, and agree with the trial court's conclusion that sections 40–9.5–201 to –207, 17 C.R.S. (1990 Supp.), are constitutional.

KIRSHBAUM, J., concurs in the result.

MULLARKEY, J., dissents.

ROVIRA, C.J., does not participate.

Justice MULLARKEY, dissenting:

I respectfully dissent from the majority's decision. In my view, the majority misconstrues the statute. Its reading is not true to the language or legislative history of the act. Sections 40–9.5–201 to –207, 17 C.R.S. (1990 Supp.), are unconstitutional because the statute requires that an annexing municipality displace the public utility and provide exclusive service. Contrary to the majority's opinion, the statute does not permit a municipality to compete with a cooperative electric association for customers in an annexed area. Whenever a municipality which operates its own electric utility annexes an area served by a cooperative electric association, the municipality must provide the exclusive electric service to the new area. Under the statute, the cooperative electric association must withdraw after annexation and the municipality must compensate the association for a "taking."

The principles governing this case are well established. Under Article V, Section 35, the Public Utilities Commission (PUC) may not regulate municipal utilities operating within municipal boundaries. *Town of Holyoke v. Smith*, 75 Colo. 286, 226 P. 158 (1924). *See also maj. op.* at 551 ("The PUC constitutionally has no jurisdiction over municipally owned utilities operating within their municipal boundaries ..."). Article XXV, which grants power to the General Assembly to regulate public utilities and vests this power in the PUC, does not "give the General Assembly authority

to regulate a *municipally* owned utility *within* the corporate limits of [a] municipality." *City and County of Denver v. Public Utilities Comm'n*, 181 Colo. 38, 46, 507 P.2d 871, 875 (1973) (emphasis in original). "These jurisdictional limitations ... necessarily restrict the scope of rights that the PUC may grant to public utilities. The PUC, in short, cannot grant a publicly owned utility greater rights than are available under the Colorado Constitution." *Union Rural Electric Ass'n v. Town of Frederick*, 670 P.2d 4, 8 (Colo.1983). Thus, it is outside the PUC's jurisdiction to grant an exclusive certificate of public convenience and necessity to a public utility to serve within the area of a municipality that operates its own utility. *See Frederick*, 670 P.2d at 6 ("[T]he grant of the certificate of public convenience and necessity to [a rural electric association] to provide electric service within the certificated area operates only to preclude *other similarly certificated public utilities within the PUC's jurisdiction* from interfering with [the rural electric association's] right to provide service.") (emphasis added). Based on these principles, we held in *Frederick* that a municipality's provision of service through its municipally owned utility to new customers within an annexed area did not constitute a taking of a public utility's right to serve the area. *Frederick*, 670 P.2d at 8–9.

To uphold the constitutionality of sections 40–9.5–201 to –207, the majority interprets *Frederick* to apply only to situations where a municipality that owns its own utility *competes* with a cooperative electric association for new customers within the limits of the municipality. *Maj. op.* at 551–552. The majority finds that these *"Frederick"* situations are excepted from the statute; it holds that no taking occurs where a municipality annexes territory and competes with a cooperative for new customers in the annexed area. *Maj. op.* at 552. The majority then states that there is no taking under the statute where an annexing municipality competes for existing customers, so long as the municipality does not condemn any of the cooperative's

distribution facilities. *Maj. op.* at 552.[1] Thus, under the majority's analysis, competition by the annexing municipality, whether for new or existing customers, does not effect a taking under the statute.[2] The majority then holds that a taking under the statute does occur where the annexing municipality excludes the cooperative from providing service to the annexed area. *Maj. op.* at 553. I cannot join the majority opinion because I see no statutory basis on which to construct the exceptions which permit the majority to save the statute. The statute does not state or imply that no taking occurs if the annexing municipality competes with the cooperative for customers. The statute mandates that the municipality provide exclusive service to customers in the annexed area.

The majority states that section 40–9.5–201 is ambiguous because it assumes a municipality operating its own utility will provide exclusive service within the annexed area but does not mandate exclusive service. *Maj. op.* at 552. The majority then attempts to resolve this ambiguity by reference to "the plain language of the statute," upon which the majority relies to hold that the statute does not mandate immediate transfer of the cooperative's customers and facilities upon annexation of the area. *Maj. op.* at 552–53. The language of the statute, however, mandates exclusive service by the municipality. Section 40–9.5–201 states, in relevant part:

> [I]f a cooperative electric association has been granted an exclusive service territory that is within a municipality that operates an electric utility or within an area annexed by a municipality that operates an electric utility, the municipality has

taken private property and *shall* pay just compensation for the electric distribution facilities and certificate of public convenience and necessity of the association located within the municipality.

(Emphasis added.) The language of this section does not distinguish between situations where an annexing municipality competes for customers and where an annexing municipality excludes the cooperative electric association. The statute simply requires an annexing municipality to compensate the cooperative electric association as specified in section 40–9.5–204(1). The statute thus contemplates that the annexing municipality will exclude the cooperative.[3]

The legislative history of the statute also reveals that the majority's exceptions are unfounded. The legislature intended that, upon annexation, the annexing municipality would exclude the cooperative electric association and pay compensation as provided in the statute. H.B. 1131, as originally introduced, gave the annexing municipality the option either to purchase the electric distribution facilities and service rights of the cooperative electric association or to grant the cooperative a permit to operate within the municipality. H.B. 1131, 55th G.A., 2d Reg.Sess. §§ 40–9.5–201, 40–9.5–206 (Colo.1986). Thus, under H.B. 1131 as introduced, the municipality could elect not to serve the annexed area. The bill, however, was amended in House Committee to remove the permit option. 1 *House Journal*, 55th G.A., 2d Reg.Sess. 199–200, 202 (Colo.1986). This change reveals that the legislature intended to require the annexing municipality to serve the annexed area since the option of allowing the cooperative

---

**1.** The majority specifically states that "[u]nder sections 40–9.5–201 to –207, Loveland and Poudre Valley could have competed for the same customers in the Hach Chemical and Collins Plating Additions and there would have been no taking...." *Maj. op.* at 553. Because there was one existing customer in each of the annexed areas at the time of annexation, I assume the majority means that the annexing municipality could compete for *existing* customers without effecting a taking under the statute.

**2.** The majority makes this point more clear when it states that "[i]f the municipality is sim-

ply competing with the cooperative in the annexed area, the cooperative has no right to compensation." *Maj. op.* at 553.

**3.** *See also* § 40–9.5–203 ("[I]f a cooperative electric association ... has certificated service territory within an area annexed ... by a municipality which owns and operates an electric utility, the municipality shall pay just compensation...."). This section also does not contain the exceptions the majority creates, and thus also mandates exclusion by the municipality.

electric association to continue to serve the annexed area was deleted.

Other changes to H.B. 1131 also reveal that the legislature intended the municipality to provide exclusive service. The original bill stated that the annexing municipality "should" either purchase the cooperative's rights and facilities or grant the cooperative an operating permit. H.B. 1131, 55th G.A., 2d Reg.Sess. § 40–9.5–201 (Colo. 1986). The House Committee changed that language to "shall" pay just compensation. 1 *House Journal*, 55th G.A., 2d Reg.Sess. 200 (Colo.1986). In addition, as first amended, H.B. 1131 provided for continued service by the cooperative electric association. The bill provided in relevant part:

> *Continued service by the cooperative electric association.* If the municipality does not acquire the electric distribution facilities and service rights of the cooperative electric association, the cooperative electric association shall continue to serve within the municipality or the area annexed by the municipality under its certificate.

*Id.* at 202. The House deleted this section. *Id.* at 527. These changes again reflect the legislature's intent that the municipality would not compete with the cooperative, but instead would provide exclusive service to the annexed area.

The Governor also specifically interpreted the statute as containing no exception for situations where the annexing municipality competes with the cooperative. The legislature passed H.B. 1131 over the Governor's veto, and in his veto letter the Governor stated as follows:

> H.B. 1131 attempts to reverse a 1983 Colorado Supreme Court ruling, the latest of several affirming the right of municipally-owned utilities to provide service to newly annexed areas. The legislative declaration that "the municipality has taken private property" is in direct conflict with the holding in *Union Rural Electric Association v. Town of Frederick* that "although an electric utility may be subject to a municipality's power of eminent domain, competition by a municipality with a certificated public utility for

> new customers does not under these circumstances constitute a taking of property which requires compensation."

1 *House Journal*, 55th G.A., 2d Reg.Sess. 1056–57 (Colo.1986). Thus, the Governor interpreted the statute as mandating that the annexing municipality exclude, rather than compete with, the cooperative electric association. The Governor interpreted the statute as overruling the holding of *Frederick* because the statute required that, upon annexation, the municipality automatically would compensate the cooperative.

In addition, as the majority acknowledges, both parties to this appeal treated the statute as mandating that the cooperative transfer its customers and facilities to the municipality upon the municipality's notice of its intent to annex the cooperative's service area. *Maj. op.* at 552. *See also maj. op.* at 556 n. 3 (again stating that both parties construed the statute as mandating exclusion and pointing out that Loveland assumed the obligation of serving the customers in the annexed area). It is worth noting that a manager of Poudre Valley Rural Electric Association, the plaintiff-appellee in this case, was instrumental in drafting H.B. 1131 and testified before the House Committee regarding the meaning of the bill. *Hearings on H.B. 1131 Before the House Committee on Agriculture, Livestock and Natural Resources,* 55th G.A., 2d Sess., Feb. 5, 1986. It therefore is not surprising that Poudre Valley's understanding of the statute, as requiring the cooperative electric association to withdraw from the annexed area, was consistent with the drafting history of the bill as it passed through the legislative process.

Given that the language of the statute, the legislative history of the statute, the contemporary interpretation of the statute as evidenced in the Governor's veto message, and the parties' interpretation of the statute all indicate that the statute mandated that the municipality exclude the cooperative electric association from serving the annexed area, I cannot agree with the majority's conclusion that the statute contains an exception for situations where the municipality competes with the cooperative.

Instead, the statute mandates that the municipality displace the cooperative and provide exclusive service. Thus, the statute effectively attempts to overrule our constitutionally-based holding in *Frederick* and therefore the statute is unconstitutional.

For the foregoing reasons, I respectfully dissent.

