## No. 79SA156

**Colorado Ute Electric Association, Inc. v. The Public Utilities Commission of the State of Colorado; Empire Electric Association, Inc.; Holy Cross Electric Association, Inc.; Gunnison County Electric Association, Inc.; La Plata Electric Association, Inc.; San Isabel Electric Services, Inc., a/k/a San Isabel Electric Association, Inc.; Southeast Colorado Power Association; Delta-Montrose Electric Association; San Miguel Power Association, Inc.; Yampa Valley Electric Association, Inc.; Grand Valley Rural Power Lines, Inc.; White River Electric Association, Inc.; Sangre De Cristo Electric Association, Inc.; San Luis Valley Rural Electric Cooperative, Inc.; and The City of Montrose, Colorado**

(602 P.2d 861)

Decided November 19, 1979.

536

Girts Krumins, R. Gregory Haller, for appellant.

J. D. MacFarlane, Attorney General, Richard F. Hennessey, Deputy, Mary J. Mullarkey, Solicitor General, John E. Archibold, Special Assistant Attorney General, for appellee The Public Utilities Commission of the State of Colorado.

Gorsuch, Kirgis, Campbell, Walker and Grover, Leonard M. Campbell, Susan K. Griffiths, for appellees Empire Electric Association, Inc. and Holy Cross Electric Association, Inc.

Frank G. Cooley, for appellee White River Electric Association, Inc.

*En Banc.*

JUSTICE DUBOFSKY delivered the opinion of the Court.

Colorado Ute Electric Association (Colorado Ute) appeals an order of the District Court of Montrose County. The order affirmed the denial by the Public Utilities Commission (commission) of several portions of Colorado Ute's rate request filed on May 14, 1976.

Specifically, Colorado Ute challenges (1) the reduction in Colorado Ute's test year expenses for costs which were not incurred until after the hearings had begun; (2) the deletion of costs associated with one of Colorado Ute's corporate aircraft; (3) the deletion of certain membership dues and fees from Colorado Ute's test year expenses; (4) the requirement of a tariff for the use of Colorado Ute's data processing system by the member cooperatives; (5) the determination of the rate of return for Colorado Ute; and (6) the order to pay witness fees and attorneys' fees to three member cooperatives who actively participated in the proceedings before the commission. Because the commission acted within its authority and its decisions were supported by the evidence, we affirm the trial court.

Colorado Ute, in an advice letter filed with the commission on May 14, 1976, proposed to increase its revenues by $4,105,590, an increase of 19.6% over its then-current revenues, based on a test year ending February 29, 1976.[1] On the assumption a rate sufficient to generate the proposed revenue increase would be granted, Colorado Ute also proposed the elimination of the fuel cost adjustment (FCA) clause which was then a part of its rate structure.

The commission suspended the effective date of the proposed rate, set hearings, and made respondents the 13 Colorado distribution cooperatives which are members of Colorado Ute Electric Association. Three of the member cooperatives actively participated in the hearings.

The commission, after full hearings, granted a $3,392,010 increase in revenues, approximately 80% of the amount originally requested by Colorado Ute.[2] In addition, the commission ordered Colorado Ute to

---

[1] The commission in the course of these proceedings changed the test year to end on April 30, 1976.

[2] Colorado Ute contends that the net award is $2,241,409 because the revenue decrease from the deletion of the FCA clause was originally subtracted from the proposed rate adjustment rather than from the revenues of the utility. Therefore, to obtain the true amount of the increase granted, the revenue loss from the deletion of the FCA clause must be subtracted from the increase granted by the commission. The commission maintains that the lost revenue from the FCA deletion was included in the calculation of the operating revenue on which the rate increase was based.

file new wholesale electric rates and to eliminate the fuel cost adjustment clause in its rate structure, even though the full rate increase had not been granted. Colorado Ute also was ordered to develop tariffs to implement a charging plan for use of its computer system by its member cooperatives and to reduce its wholeslae electric rates proportionately. Finally, the commission ordered Colorado Ute to pay attorneys' fees and witness fees to the respondents who actively had participated in the proceedings.

The trial court, which affirmed the commission's decisions, found there was competent evidence in the record to support those decisions. Moreover, the court found no indication that the commission had acted in an arbitrary or capricious manner or that it had violated the constitutional rights of petitioner Colorado Ute.

### Out-of-Period Adjustment

The commission adopted an out-of-period adjustment reducing Colorado Ute's test year purchased wholesale power costs and transmission expenses by $238,160. It based this adjustment on a prospective settlement rate stipulated to by Colorado Ute and its supplier, the Public Service Company, and approved by the Federal Power Commission on November 8, 1976 — approximately six months after the conclusion of Colorado Ute's test year.

Colorado Ute does not contest seriously the commission's authority to make an out-of-period adjustment reducing its test year expenses to compensate for post-test year reductions in the basic rate paid for power purchased from Public Service Company. It contends, however, that the commission abused its discretion by adjusting for an item which reduced the costs while refusing to make corresponding adjustments for items which increased costs. Colorado Ute proposed two such adjustments to the commission: one based on higher interest rates charged on post-test year borrowing, and a second to compensate for cost increases passed through to Colorado Ute under Public Service Company's FCA clause.[3]

The commission justified its refusal to adjust for these increased costs on the ground that they were mere "projections" while the reduced basic rate which would be paid for purchased power was "known and certain." Colorado Ute responded that the increased costs attributable to interest rates and FCA charges were equally "known and certain" — at least for the six month interval between the end of the test year and the date the settlement rate was accrued.

---

[3] The settlement between Colorado Ute and Public Service Company merely set a lower basic rate. Public Service Company was still entitled to automatically pass increased fuel costs through to Colorado Ute under its FCA clause.

■ This Court has approved the use of the historic relationship between test year investments, revenues and expenses as a basis for calculating the rate increases necessary to assure utilities a reasonable rate of return on their capital investments. At the same time, mindful of the fact that rates are fixed prospectively, it is recognized that selective out-of-period adjustments to test year figures must sometimes be made to compensate for known post-test year changes which affect their historic relationship. *Mountain States Telephone and Telegraph Company v. Public Utilities Commission.* 182 Colo. 269, 276, 513 P.2d 721, 724 (1973).

■ Although the commission's refusal to set actual post-test year increases in the cost of debt and purchased power off against reduced post-test year purchased power rates may at first glance appear to be arbitrary, it must be remembered that the legislature has vested the commission with considerable discretion in its choice of the means used to fix rates. As this Court has repeatedly emphasized, rate-making is not an exact science, but a legislative function involving many questions of judgment and discretion. *Public Utilities Commission v. Northwest Water Corp.,* 168 Colo. 154, 451 P.2d 266 (1969). While "[t]his judgment or discretion . . . must be based upon evidentiary facts, calculations, known factors, relationship between known factors, and adjustments which may affect the relationship between known factors,"[4] we cannot say that the commission's decision to adjust for only one of several out-of-period changes was an abuse of its discretion. The adjustment reducing Colorado Ute's purchased power expenses was supported by competent evidence and will not be set aside by this Court. *Sangre De Cristo Electric Association v. Public Utilities Commission,* 185 Colo. 321, 524 P.2d 309 (1974).

■ Moreover, the refusal to adopt Colorado Ute's proposed adjustments was within the commission's sound discretion. At oral argument, counsel for the commission stated that a set-off of "locked in" interest and power cost increases occurring during the six months following the end of the test year would substitute a one-half historical test year for the adjusted historical test year which, as a matter of commission policy, is used as the baseline for calculating rates. As the United States Supreme Court observed in *Federal Power Commission v. Hope Natural Gas Company,* 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944), it is the result reached, not the method employed, which determines whether a rate is just and reasonable. We would overstep our role and demean the commission's authority in the legislative field of rate making were we to insist that the commission revise its method of making out-of-period adjustments in the absence of persuasive evidence that the challenged method is

---

[4] *Mountain States Telephone and Telegraph Company,* 182 Colo. at 280, 513 P.2d at 726.

inherently unsound. *Mountain States Telephone and Telegraph Company,* 182 Colo. at 275, 513 P.2d at 724.

No such evidence is presently before us and we therefore decline to curtail the commission's legislative discretion to elect between different acceptable methods of computing test year expenses.

### Aircraft Expenses

Colorado Ute operated two King Air aircraft with seating capacity of eight passengers each. The aircraft were used to facilitate employee travel between widely separated cities and towns within the utility's service area. However, Colorado Ute permitted non-employees to use the aircraft on a space available basis. The commission, relying on an analysis performed by one of its staff members, concluded that Colorado Ute utilized each aircraft at approximately one-half capacity. It therefore deducted certain capital and operating expenses attributable to one of the aircraft from Colorado Ute's rate base and test year operating expenses. The district court found that the record contained competent evidence of non-consumer benefits in the use of the airplanes and affirmed the commission's decision.

Colorado Ute argues that these deductions lacked competent evidentiary support. Its principal contentions are first, that the exhibits and testimony adduced to prove under-utilization were so riddled with factual and mathematical errors that they were incompetent to substantiate the commission's conclusion, and second, that the commission arbitrarily departed from its own earlier determination that operation of the two aircraft in question resulted in cost savings and in the efficient use of manpower resources.

 While it cannot be denied that some of the aircraft utilization calculations submitted to the commission were in error, neither can it be doubted that the commission received evidence, based on data supplied by Colorado Ute itself, which tended to show under-utilization of aircraft seating capacity by Colorado Ute employees, non-employee travel on the airplane on a space available basis and scheduling inefficiencies. This is certainly competent evidence from which the commission could have inferred that capital and operating expenses attributable to one of the two King Airs did not benefit Colorado Ute customers and therefore should be stricken from Colorado Ute's rate base and test year operating expenses. Although Colorado Ute disputes this evidence and claims that other means of transportation will not prove to be as cost effective as its aircraft, it is well established that "where there is competent evidence to support the findings of the Commission, a reviewing court may not substitute its judgment for that of the Commission." *Sangre De Cristo Electric Association, Inc. v. Public Utilities Commission, supra.*

 Colorado Ute's second contention — that the commission arbitrarily overruled its earlier decision — is without merit. Because of the

legislative character of rate-making, the commission is not bound by its prior decisions or by any doctrine similar to *stare decisis. B & M Service, Inc. v. Public Utilities Commission,* 163 Colo. 228, 232-233, 429 P.2d 293, 295 (1967). Moreover, while consistency in administrative rulings is considered essential, and while agency rulings are entitled to great weight in subsequent proceedings, *id.,* the appearance of arbitrariness is dispelled when new findings are made, as they were here, on the basis of new evidence and a new record.

### Dues and Fees

The commission deleted Chamber of Commerce and trade organization corporate membership dues and fees aggregating $8,868 from Colorado Ute's test year expenses. Two reasons were given for the adjustment: first, based on an assessment of the expenditures' value to ratepayers, the commission was "not persuaded that the expenses . . . were shown to be a proper operating expense;" second, the deletions conformed to "past commission practice." Colorado Ute challenges both justifications offered for the adjustment. The utility contends that the record is barren of evidence that the dues and fees were not beneficial to ratepayers.

■ Colorado Ute's allegations that the adjustment lacks support in the record is wide of the mark. The commission is not charged with the burden of showing why expenses should be excluded from the utility's test year operating revenue deduction. To the contrary, it is the responsibility of the utility to show that an expense will benefit ratepayers before it may be charged as a proper operating expense. "If in the judgment of the PUC evidence is insufficient to establish that a particular result will occur, it is within its prerogative to decline to find that such a result will occur." *Mountain States Telephone and Telegraph Co. v. Public Utilities Commission,* 195 Colo. 130, 142, 576 P.2d 544, 553 (1978).

According to the testimony offered by a commission staff witness, Colorado Ute failed to adduce any evidence that its Chamber of Commerce, Club 20 and Colorado Rural Electric Association (CREA) dues were beneficial to its ratepayers (although certain fees paid to CREA were allowed as proper expenses). Nor does our scrutiny of the record reveal any evidence of benefits accruing to Colorado Ute's customers as a direct result of its affiliation with these organizations. There is, therefore, little merit in the utility's contention that the commission acted arbitrarily and capriciously in adjusting its expenses to exclude the dues and fees in question.

### Use of Data Processing System

Colorado Ute entered into contracts with six of its thirteen members authorizing them to use the utility's excess electronic data processing capacity without charge if they furnished Colorado Ute with certain billing information. The commission found that this arrangement discriminated against the seven non-participating members who paid wholesale power

rates which subsidized the cost of the computer services utilized by the six participating members. The commission therefore ordered Colorado Ute and participating members to negotiate and adopt a charging plan to provide for reimbursement of those costs.

Colorado Ute argues that this conclusion is contrary to law, lacks evidentiary support and, inasmuch as it is inconsistent with an earlier commission decision that the arrangement was beneficial to Colorado Ute's member cooperatives, arbitrarily voids Colorado Ute's contracts with its participating members.

 Contrary to Colorado Ute's contentions, there is competent evidence in the record supporting the conclusion that all thirteen members were paying for costs incurred by the six members using the computer. The commission could conclude that these costs were not properly chargeable to the non-participating members and order Colorado Ute and the six remaining members to adopt a charging plan reimbursing Colorado Ute for their use of its data processing facilities. *See Sangre De Cristo Electric Association, supra.*

 Moreover, as we have observed in connection with the aircraft issue, the commission is not bound by *stare decisis.* Here, reversal of its earlier decision was supported by new evidence and a new record and, therefore, was neither arbitrary nor unreasonable. *See B & M Service, Inc. v. Public Utilities Commission, supra.*

### Rate of Return

In addition to the foregoing specific objections to the adjustments and orders made by the commission, Colorado Ute complains that the commission approved a clearly confiscatory and insufficient rate of return. The end result, Colorado Ute contends, is that its annualized cost of debt exceeds its operating margins.

Unlike investor owned utilities, Colorado Ute's capital structure consists almost exclusively of debt financing. The commission has therefore adopted a times interest earnings ratio (TIER) in place of a percentage rate of return on investment as its measure of the earnings needed to enable Colorado Ute to pay capital costs out of current revenues.[5] In the present proceeding, the commission found that a TIER of 1.92 was sufficient to assure Colorado Ute's fiscal integrity. While Colorado Ute does not quarrel with this figure, it contends that the commission seriously underestimated its interest expenses. As a result, the utility claims, the operating margins allowed it under the approved rates are not 1.92 times greater than its capital costs, but are, in fact, insufficient to pay those costs.

---

[5] TIER expresses the ratio of the utility's operating margins (net income) to its interest expenses. If earnings are less than the interest payable on debt, the TIER will be less than 1.0; if earnings exceed the cost of capital, the TIER will be greater than 1.0.

The commission does not dispute Colorado Ute's contention that its gross annualized long-term interest exceeds the operating margins allowed it under the revised rates. However, it notes that gross annualized interest is not used in calculating the margins needed to achieve a given TIER. Instead, that portion of the gross interest attributable to projects presently under construction is capitalized and deducted from the gross interest costs. Only the remainder — or expensed interest — is used in calculating the operating income required to yield the TIER. The purpose of this adjustment is to insure that current ratepayers do not pay for facilities which will be used and useful only in the future.

Colorado Ute and the commission are in disagreement concerning the amount of annualized long term interest which should be capitalized. The utility proposed a figure which it claimed represented the interest actually charged to construction during the test year; the commission adopted a higher figure reflecting Colorado Ute's historical capitalization of long term interest and therefore allocated a proportionately smaller sum to expensed interest. As a result, Colorado Ute was allowed electric operating margins of $6,532,451, while its gross annualized interest costs total $7,048,515. Because these costs exceeded its allowed margins, Colorado Ute contends that it was forced to sell power at a deficit and attacks the rates fixed by the commission as unjust, unreasonable and confiscatory.

Colorado Ute's contentions notwithstanding, there was evidence in the record to support the commission's decision to allocate a larger sum of capitalized interest than Colorado Ute had proposed. We therefore will not substitute our judgment for that of the commission. *Sangre De Cristo Electric Association, Inc. v. Public Utilities Commission, supra.* Moreover, as the commission maintains, the sums now allocated to Colorado Ute's capitalized interest account will be recovered when facilities now under construction go on line and interest on the debts incurred to finance them can be charged to expenses. The deficit of which Colorado Ute complains is simply a by-product of the fundamental rate-making principle that current ratepayers should not be compelled to pay for facilities which will be used and useful only in the future.

Colorado Ute also protests that the insufficiency of its rate of return is compounded by the commission's deletion of the utility's fuel cost adjustment clause from its rate structure. While Colorado Ute had originally proposed the deletion, it had made its proposal conditional on approval of rate increases in the amount sought, recognition of the additional risk by authorization of a higher TIER and abatement of regulatory lag. However, the commission, finding that projected increases in the cost of coal would not be severe enough to justify utilization of a fuel cost adjustment[6]

---

[6] Section 40-6-113(6), C.R.S. 1973, authorizes the commission to consider information secured on its own intiative. *See Consolidated Freightways v. Public Utilities Commission,* 158 Colo. 239, 406 P.2d 83 (1965). The commission based its projections of coal costs on "fuel cost escalation sheets" filed with it by Colorado Ute.

eliminated the allowance from Colorado Ute's tariffs even though none of these conditions had been met.

Colorado Ute also complains that undue regulatory lag resulted in a confiscation of its property. The revised rates approved by the commission were not made effective until six days after the 210-day suspension period authorized by section 40-6-111(1), C.R.S. 1973, had expired. Since the commission had found that the rates in effect during the suspension period were unfair and unreasonable, Colorado Ute contends that the delay in promulgating the revised rates forced it to sell power at confiscatory rates during the interim six day period. This argument is not well taken.

Section 40-6-111 does not require the commission to promulgate revised rates within 210 days following suspension of the rates filed by the utility, but after the 210 days have elapsed, the utility is entitled to charge the rates originally filed with the commission until such time as the commission enters its rate order. The statute specifically provides that "On such hearing [concerning the propriety of filed rates] whether completed before *or after* the expiration of the period of suspension, the commission shall establish the rates . . . which it finds just and reasonable." Section 40-6-111(2), C.R.S. 1973. (Emphasis added.) This subsection clearly authorizes the commission to establish revised rates after the suspension period has run if the hearing on the filed rates has not been completed in that time. In this case the six-day delay complained of was occasioned by Colorado Ute's application for a rehearing, reargument or reconsideration of rates set at the earlier hearing. This application was filed the day before the revised rates were to become effective and two days before the expiration of the suspension period. Colorado Ute should not now be heard to complain that consideration of its own application delayed the effective date of the revised rates for several days past the conclusion of the 210-day period.

### Attorneys' Fees

Finally, the commission ordered Colorado Ute to pay a portion of the fees of the attorneys and witnesses for Empire, Holy Cross, and Southeast Power Association. Granting that the commission has the authority to award attorneys' fees, *Mountain States Telephone and Telegraph Co. v. Public Utilities Commission,* 195 Colo. 130, 576 P.2d 544 (1978), Colorado Ute argues that it is unfair to require that member cooperatives share in the costs of some of the members' attorneys and experts when each of the cooperatives had its own attorneys and when there was not consultation among the member cooperatives before hiring expert

witnesses.

Under *Mountain States, supra,* the commission has broad constitutional and statutory discretion to determine when attorneys' fees should be awarded in its own proceedings. *Colo. Const.* Art. XXV, and 40-3-102, C.R.S. 1973. The commission's standard for determining a fee or costs award, as approved in *Mountain States,* has three criteria: (1) the representation and expenses incurred relate to general consumer interests; (2) the testimony, evidence and exhibits provided "materially assist the Commission" in reaching its decision; and (3) the fees and costs incurred are reasonable.

Here, the commission determined the fees and costs came within the *Mountain States* standard. Moreover, because of its concern that these fees ultimately would be borne by the member cooperatives and their customers, the commission imposed two additional standards. The first was that the services performed be exceptional, and the second that they materially contribute to the decision of the commission (the standard in *Mountain States* was "materially assist").

After application of the more stringent standards, the commission allowed, as the basis for awards of attorneys' fees and costs, only the services of the attorneys and expert witnesses which related to general concerns of the consumers of Colorado Ute power and resulted in a lower rate increase. No award was made for services for the special concerns of the member cooperatives.

Thus, the fees and expenses of $26,342.78 requested by the law firm of Troupe, Kehoe, Whiteaker & Kent were reduced by the commission to $8,851.25 and the fees and expenses of $33,500 requested by Gorsuch, Kirgis, Campbell, Walker & Grover were reduced to $20,000.

The result of the commission's award is that the thirteen member cooperatives share the cost as passed along by Colorado Ute of the witnesses and attorneys who presented testimony of general concern. In addition, each of the member cooperatives pays its own attorneys and witnesses for representation of its special concerns. The award of fees and costs is within the authority of the commission, and reasonable under the circumstances of the case.

### Conclusion

We conclude that none of the claims brought by Colorado Ute justify a reversal of the commission or the district court.

Judgment affirmed.