Justice HOBBS
 

 delivered the Opinion of the Court.
 

 In this appeal from the district court pursuant to section 40-6-115(5), 11 CRS. (2000),
 
 [1]
 
 Public Service Company of Colorado (Public Service) asserts that the Public Utilities Commission of Colorado (the Commission) acted arbitrarily and capriciously in its ratemaking authority by reducing Public Service's revenue increase request. We hold that Public Service failed to meet its burden of proof that the Commission's actions were unlawful. We determine that the Commission acted within its authority, that its decision was just and reasonable, and that its decision was supported by substantial evidence. Accordingly, we affirm the judgment of the district court upholding the Commission's action.
 

 L.
 

 On June 5, 1996, Public Service filed a request with the Commission to implement General Gas Rate Schedule Adjustment riders to be applied to base rates under Public Service's gas schedules. The riders proposed by Public Service would have increased gas department revenue by $33,996,407. Public Service sought the rate increase to recover capital and operating costs related to infrastructure expenditures. As justification for the revenue increase, Public Service cited a dramatic increase in the number of gas customers during the 1998-1998 period. The Office of Consumer Counsel (OCC)
 
 [2]
 
 intervened by right, and set forth its own proposal for adjustments to the riders.
 

 In a series of orders, the Commission suspended the effective date of the proposed rate increases until February 1, 1997, and set
 
 *1202
 
 conferences and hearings thereon. At a hearing held in December 1996, experts called by Public Service, OCC, and the Commission testified to the appropriateness of Public Service's proposed revenue increase. Based on the data submitted and the expert testimony provided, the Commission approved rate increases yielding additional revenues for Public Service's gas department of $17,565,578, or approximately $16.4 million less than the $33,996,407 Public Service had requested.
 

 Both Public Service and OCC applied for reconsideration, which the Commission granted. The adjustments on reconsideration at issue before us included: (1) a reduction of $8,589,566 based on anticipated future cost savings associated with Public Service's pending merger (the Merger Savings Adjustment) with Southwestern Public Service Company (Southwestern); and (2) a disal-lowance of $3,009,088 in amortized costs associated with a change in accounting methodology adopted pursuant to Statement of Financial Accounting Standards Rule 112 (SFAS 112), promulgated by the Financial Accounting Standards Board (FASB) (the SFAS 112 Transition Adjustment).
 

 After rehearing, the Commission affirmed its earlier decision on both adjustments, but increased the amount of the Merger Savings Adjustment from $8,589,566 to $5,111,300. The resultant total final reduction in revenue requested by Public Service amounted to $15,380,095. Public Service took an appeal to the district court pursuant to section 40-6-115(5), and the district court affirmed. We affirm the judgment of the district court upholding the Commission's decision.
 

 A.
 

 The Merger Savings Adjustment
 

 On November 9, 1995, Public Service filed a merger and incentive regulation application with the Commission, seeking authorization to merge with Southwestern through formation of a registered public utilities holding company. As part of its application, and for the purpose of showing that the merger was in the public interest, Public Service presented evidence that it would save approximately $770 million on costs company-wide during the first ten years following the merger. The evidence illustrated that Public Service would derive these savings from corporate restructuring, labor force reductions, and increased operating efficiency. The Commission approved the merger in November 1996 while this proceeding was still pending. Public Service and Southwestern finally consummated the merger in August 1997.
 

 At the same time the Commission approved the merger, Public Service stipulated by agreement that it would reduce electric service rates as of the same day the gas rate increase proposed in this action became effective. In this manner, Public Service would pass through anticipated first-year merger savings to its electric customers. But this stipulation made no provision for passing first-year merger savings to Public Service's gas customers, nor did it set a date for a future commission gas ratemaking proceeding before the Commission.
 

 The Merger Savings Adjustment at issue in this appeal arose out of the Commission's plan to pass first-year merger savings to Public Service's gas customers as well as the electric customers. The Commission's initial order found that the uncertainty surrounding when Public Service would file its next general rate case proceeding dictated that a gas rate adjustment be made. The Commission agreed with OCC that the merger was an extraordinary, one-time event that mandated an adjustment, as it involved a complete corporate restructuring. Based on Public Service's projected company-wide merger savings of $770 million, the Commission calculated a Merger Savings Adjustment of $3,589,566 attributable specifically to the gas department during the first year following the merger.
 

 In its application for Rehearing, Reargument or Reconsideration, Public Service argued: (1) that its recent commitment to file a rate case by October 1, 1998 invalidated the Commission's out of period Merger Savings Adjustment and its determination that gas customers would have no other opportunity to recover first-year merger savings; (2) that actual cost savings associated with the merger and attributable to the gas department
 
 *1203
 
 could be incorporated into the newly filed rate case, thereby eliminating the need for estimating merger cost savings; and (8) that the Commission made several erroneous assumptions in its calculations and violated the matching principle by failing to offset $50 million in capital expenditures against the out of period Merger Savings Adjustment. The Commission disagreed, affirmed its prior decision that a Merger Savings Adjustment was proper, and increased the adjustment to $5,111,300, taking into account OCC evidence and argument.
 

 On appeal, the district court affirmed the Commission's decision. The district court found that simply because the cost savings were projections did not make them improper, and the Commission acted within its authority when it made the gas rate adjustment. The district court characterized Public Service's assertion that there would be another opportunity for gas customers to receive the benefit of first-year merger savings as a factual issue within the expertise of the Commission, which it should not disturb. Finally, the district court found that the Commission did not violate the matching principle, as Public Service did not argue at the hearing before the Commission that the $50 million capital expenditure should be considered as a test year adjustment, or that it was related to the merger.
 

 B.
 

 The SFAS 112 Transition Adjustment
 

 In 1992, FASB promulgated a new rule, SFAS 112, to become effective for fiscal years beginning after December 15, 1998. SFAS 112 required public companies like Public Service to account for certain post-employment benefits on an acerual instead of on a pay-as-you-go basis, as had been Public Service's practice. SFAS 112 covered post-employment benefits prior to retirement, including salary continuation, supplemental unemployment, severance benefits, disability-related benefits, job training and counseling, and continuation of health care and life insurance.
 

 When Public Service made the transition from pay-as-you-go to acerual accounting pursuant to SFAS 112 on January 1, 1994, it created a transition obligation or "regulatory asset" on its books for financial reporting purposes. The transition obligation consisted of the difference between the pay-as-you-go amounts previously expensed for post-employment benefits and the total amount necessary to cover future benefits for accrual method of accounting. Public Service calculated this transition obligation to be $8.9 million. Instead of consolidating this total amount as a one-time charge and seeking a rate adjustment in 1994 to cover it, Public Service deferred the cost by booking internally a regulatory asset in accordance with SFAS 71
 
 [3]
 
 In this ratemaking proceeding, Public Service sought to amortize the total regulatory asset over three years and apply approximately $3 million against 1995 test year expenses.
 

 In its initial order, the Commission questioned whether Public Service could delay recovering the SFAS 112 transition obligation as a regulatory asset under SFAS 71. Unlike other similar accounting rules promulgated by FASB, SFAS 112 did not contain a provision for establishing, deferring, and recovering a regulatory asset. The Commission agreed with OCC's assertion that the transition obligation became a legitimate period cost for 1994 when Public Service adopted SFAS 112, The Commission held, however, that Public Service should have expensed those legitimate period costs in 1994, when it adopted SFAS 112
 
 [4]
 
 The
 
 *1204
 
 Commission agreed with the OCC's evidence and contention that company-wide revenues in 1994 and 1995 were sufficient to cover the transition obligation.
 

 In its application for Rehearing, Reargument, or Reconsideration with the Commission, Public Service argued: (1) that the transition obligation was a reasonable and legitimate ratemaking expense; (2) that it would have recovered all of the costs over time if it did not switch from pay-as-you-go to accrual method of accounting for ratemak-ing purposes; (8) that without a finding by the Commission that the costs were imprudently incurred, the Commission must either decline to approve the accrual method or allow future recovery of the transition costs; and (4) that the Commission should allow recovery of the transition costs here just as it allowed for recovery of the transition obligation created pursuant to SFAS 106. These Public Service arguments did not persuade the Commission; the Commission affirmed its initial decision.
 
 [5]
 

 On appeal, the district court also affirmed the Commission's decision, based on three findings. First, the district court found that Public Service was in an awkward position to object to the Commission's complete adoption of SFAS 112, as it advocated for adoption of the rule for accounting purposes. Second, the district court found that if Public Service believed the transition obligation was so large that 1994 revenues could not absorb it, Public Service should have filed a ratemaking case at that time, not two years later. Finally, the district court noted that resolution of this matter depended on complex interactions between ratemaking and accounting, an area of Commission expertise.
 

 IL
 

 We hold that Public Service did not meet its burden of proving that the revenue adjustments made by the Commission in this proceeding are unlawful. The Commission's decision to reduce Public Service's revenue increase in light of projected merger savings and an untimely sought accounting adjustment was within its authority and was not unreasonable or unjust. Substantial evidence in the record supports the Commission's decision in this case.
 

 A.
 

 Standard of Review
 

 The constitution and laws of Colorado vest the Commission with power to regulate utility rates. Colo. Const. art. XXV; § 40-3-102. The Commission exercises its regulatory power in a legislative capacity. CF & I Steel, L.P. v. Public Utils. Comm'n, 949 P.2d 577, 584 (Colo.1997); Mountain States Tel. & Tel. Co. v. Public Utils. Comm'n, 195 Colo. 130, 135, 576 P.2d 544, 547 (1978); Public Utils. Comm'n v. Northwest Water Corp., 168 Colo. 154, 167, 451 P.2d 266, 278 (1969). The Commission operates within a framework bounded by its enabling legislation and regulations, the Colorado Constitution, and applicable federal statutes and regulations. CF & I Steel, 949 P.2d at 585.
 

 The Commission exists to protect consumers while affording monopoly status to the utility provider. To further this purpose, and pursuant to its constitutional and statutory mandate, the Commission's essential function is to ensure that all rate charges are fair and reasonable to ratepayers and the utility. § 40-8-101. The Commission's goal is to set rates at a level whereby the utility can recover its legitimate costs and expenses,
 
 *1205
 
 garner a reasonable rate of return, and maintain the financial stability of Public Service for creditor and investor confidence. Public Serv. Co. v. Public Utils. Comm'n, 644 P.2d 933, 985 (Colo.1982). The legislature gave the Commission power to adopt all necessary rates and charges required to prevent rate discrimination and extortion. § 40-3-102.
 

 The Commission's expertise extends to its fact-finding and policy-making authority. CF & I Steel, 949 P.2d at 584. Courts will not set aside questions of judgment and discretion in the rate setting process "unless they are inherently unsound." Id. The Commission's decision making power is not limited by stare decisis when a reasonable basis exists to depart from a previous decision. Id. Judicial review of a Commission ratemaking decision occurs by appeal to the district court within thirty days of the final decision, and then by appeal to the supreme court. § 40-6-115(1), -115(5).
 

 The Commission's findings and conclusions of disputed fact are final, subject to review only on the ground that the decision they support violates the challenger's rights under the United States or Colorado constitutions. § 40-6-115(2). The district court's review extends only to determining whether the Commission regularly pursued its authority, and whether the Commission's decision was just and reasonable and made in accordance with the evidence. CF & I Steel, 949 P.2d at 584.
 

 There is a strong presumption in favor of conclusions made by the Commission in ratemaking cases. See id. at 585; see also Northwest Water Corp., 168 Colo. at 172, 451 P.2d at 275. "The judiciary must refrain from any semblance of rate setting in deference to the lawfully empowered authority, here the [Commission]." CF & I Steel, 949 P.2d at 585. Courts defer to the Commission's interpretations of its own decisions and regulations, but set aside decisions that are "clearly erroneous, arbitrary, in exeess of the [Commission's] authority, or not in accordance with the law." Id. Further, courts presume that the Commission's decisions are reasonable and valid. Id. The challenger of a Commission decision has the burden of proving its unlawfulness. Id.
 

 Judicial review in this court focuses on three issues: (1) "whether the Commission has regularly pursued its authority"; (2) "whether its decision is just and reasonable"; and (8) "whether its decision is supported by substantial evidence in the record viewed as a whole" and in a light most favorable to the Commission. Id. In considering whether the Commission has regularly pursued its authority, we recognize that the Commission "has broadly based authority to do whatever it deems necessary to accomplish the legislative functions delegated to it." City of Boulder v. Public Utils. Comm'n, 996 P.2d 1270, 1277 (Colo.2000). To decide whether the Commission's actions are just and reasonable, we defer to the Commission's extensive expertise, and realize that the commissioners are in a much better position than courts to assess ratemaking decisions in light of the public interest. Id. at 1279.
 

 The Commission's ratemaking decisions must be supported by substantial evidence in the record. Id. at 1278. The court decides as a matter of law whether substantial evidence exists. Id. We have defined substantial evidence as
 

 more than a sceintilla, and it must do more than create a suspicion of the existence of the fact to be established. It means such relevant evidence as a reasonable person's mind might accept as adequate to support a conclusion ... it must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury.
 

 Id.; see also Integrated Network Servs. v. Public Utils. Comm'n, 875 P.2d 1373, 1378 (Colo.1994).
 

 Having articulated the standard of review, we now turn to the case at hand.
 

 B.
 

 The Merger Savings Adjustment
 

 Public Service objects to the Merger Savings Adjustment on three grounds. First,
 
 *1206
 
 Public Service asserts that the Commission improperly made the Merger Savings Adjustment outside the 1995 test year, and adjustments made outside the test year may oceur only when costs are known and measurable. Second, contrary to the Commission's findings, Public Service argues that this ratemaking case was not the only opportunity for gas customers to receive the benefit of first-year merger savings; a subsequently filed case afforded gas customers that same opportunity at a time when the cost savings were more than speculation. Third, Public Service claims that since the Commission made the Merger Savings Adjustment out-of-period, it should have also made another $50 million out-of-period adjustment for infrastructure improvement, in accordance with the matching principle. Public Service claims that the Commission's action in all three respects constituted arbitrary and capricious decision making.
 

 We disagree. The Commission's decision to include the Merger Savings Adjustment was within its authority under section 40-3-102, was just and reasonable, and was supported by substantial evidence. We consider each criterion in turn.
 

 1. The Commission's Authority
 

 The Commission enjoys broad discretion and authority in exercising its rate-making function, a legislative ratemaking activity. § 40-38-1022; City of Boulder, 996 P.2d at 1277. Recognizing the Commission's special expertise in utilities regulations and rate-making proceedings, we defer to its selection of rate adjustments in reaching its final decision. City of Boulder, 996 P.2d at 1277.
 

 Public Service first asserts that the Commission made an improper out-of-period adjustment, because neither the Commission nor Public Service could estimate the magnitude of projected first-year merger savings with the precision required for rate-making. We stated in Colorado Ute Electric Association v. Public Utilities Commission, 198 Colo. 534, 539, 602 P.2d 861, 864 (1979) that "rate-making is not an exact science, but a legislative function involving many questions of judgment and discretion." See also Krupp v. Breckenridge Sanitation Dist., 19 P.3d 687, 694 (Colo.2001). The Commission need not know with precise accuracy the magnitude of an out-of-period adjustment to properly make it. Colorado Ute, 198 Colo. at 539, 602 P.2d at 864. '
 

 After rehearing, the Commission based the Merger Savings Adjustment on testimony and calculations presented by an OCC expert,. The Commission specifically found that these calculations correctly analyzed the anticipated merger savings.
 

 Public Service and the Commission agreed to use the year ending December 1995 as the test year for this ratemaking case. We adopted the test year methodology for ratemaking in Mountain States Telephone & Telegraph Co. v. Public Utilities Commission, 182 Colo. 269, 275, 513 P.2d 721, 724 (1973). The first step in a ratemak-ing case is selecting a test year for the Commission to base rates upon. The test year establishes a reliable relationship between costs, investment, and revenue from which the Commission estimates fair and reasonable rates. Id. at 276, 513 P.2d at 725. The Commission does not blindly adhere to the operating results from the test year, but makes in-period and out-of-period adjustments so that the rates it sets accurately take into account predicted future conditions. Id. at 275, 513 P.2d at 724.
 

 In-period adjustments include known changes in costs, investments, and revenues occurring during the test year. See Colorado Ute, 198 Colo. at 539, 602 P.2d at 864. Out-of-period adjustments are those changes to costs, revenues, or investments that have "occurred or will occur, or [are] expected to occur after the close of the test year." Mountain States Tel. & Tel., 195 Colo. at 141, 576 P.2d at 552. We held in Mountain States Telephone & Telegraph that in setting rates, the Commission should consider out-of-period adjustments contract ed for in the test year, but which do not take effect until after the test year. See id.
 

 Public Service filed a mérger application with the Commission in November 1995, but did not complete the merger until August 1997, some twenty months after completion of the test year. The Commission held the
 
 *1207
 
 first hearing on the merger in December 1996. At that time, the merger itself required only regulatory approval for completion. Public Service and Southwestern had essentially "contracted" for the merger during the test year, but the effects of the merger would not occur until after the test year. Under these circumstances, according to Mountain States Telephone & Telegraph, 195 Colo. at 141, 576 P.2d at 552, the Commission properly made an out-of-period merger adjustment.
 

 Next, Public Service asserts that the Commission could have made the Merger Savings Adjustment in a subsequent rate case. The Commission is not prohibited from making a merger adjustment in this case simply because Public Service determined to commit to filing a gas ratemaking case by October 1998. The Commission found that Public Service's gas customers should receive the benefit of some of the cost savings on which the merger and corporate restructuring was premised in the first place. Public Service does not dispute that contention, but only its timing. An arguably better opportunity to adjust rates does not make the actual adjustment here outside the Commission's authority, as the Commission may act reasonably in its legislative capacity to accomplish its ratemaking function. See City of Boulder, 996 P.2d at 1278.
 

 Public Service asserts that if the Commission made an out-of-period adjustment for the merger, it should have also made a like adjustment to account for capital investments of approximately $50 million made by Public Service for gas department infrastructure. We disagree. First, Public Service did not assert that the $50 million infrastructure cost should be applied to test year expenses until the Commission issued its initial order. Second, in its discretion, the Commission may make certain out-of-period adjustments and not others. See Colorado Ute, 198 Colo. at 539, 602 P.2d at 864 (holding that "we cannot say that the commission's decision to adjust for only one of several out-of-period changes was an abuse of discretion"). Third, the Commission found that the merger was an extraordinary event, capable of producing immediate savings for Public Service's gas customers, as it involved a complete corporate restructuring. Under these cireumstances, the Commission may properly make only certain out-of-period adjustments. See Colorado Mun. League v. Public Utils Comm'n, 687 P.2d 416, 425 (Colo.1984) (holding that the Commission should not adjust one part of the equation "without adjusting the other unless there is a finding that the particular expenditure is extraordinary ") (emphasis in original).
 

 Finally, the Merger Savings Adjustment does not violate the matching principle. We stated in Colorado Municipal League, 687 P.2d at 422, that in order for the test year to be proper, revenues and costs must match each other. This matching principle helps assure that Public Service charges ratepayers the cost of producing the service they actually receive. See Town of Norwood v. Federal Energy Regulatory Comm'n, 53 F.3d 377, 380-81 (D.C.Cir.1995). The matching principle does not, however, prohibit all one-sided adjustments. Colorado Mun. League, 687 P.2d at 425 (recognizing that one-sided adjustments may occur if the expenditure is extraordinary). Further, the matching principle envisions offsetting related costs and revenues, see id. (finding that the cost of wage increases may be offset against an increase in productivity), not those at issue here.
 

 Accordingly, we find that the Commission's gas rate adjustment decision was within its authority.
 

 2. Just and Reasonable
 

 We examine whether a decision by the Commission was just and reasonable bearing in mind the "considerable discretion Colorado law [vests] in this agency," and its singular expertise and authority to protect the public interest in ratemaking cases. City of Boulder, 996 P.2d at 1279. "[Wle defer to the [Commission's] finding that a utility action benefits the public," and find such actions just and reasonable. Id. Here, the Commission specifically found that Public Service's gas customers should receive the benefit of some of the cost savings on which the merger and corporate restructuring is
 
 *1208
 
 premised. In so finding, the Commission acted to protect the public from paying gas rates exceeding the costs incurred by Public Service to provide its service. Accordingly, we conclude that the Commission's decision was just and reasonable.
 

 3. Substantial Evidence
 

 To decide whether substantial evi-denee exists in the record, we view the record in a light most favorable to the Commission. City of Boulder, 996 P.2d at 1278. The evidence must adequately support the Commission's decision. Id. The Commission's decision must be based on "evidentiary facts, calculations, known factors, relationship between known factors and adjustments which may affect the relationship between known factors." Colorado Ute, 198 Colo. at 539, 602 P.2d at 864.
 

 Here, the Commission based its decision to make the $5.1 million Merger Savings Adjustment on evidentiary facts, known factors, and relationships between known factors; it specifically found that OCC's calculations correctly portrayed the Merger Savings Adjustment. In doing so, the Commission accepted Public Service's assertion that the Merger Savings Adjustment should not be based on calculations designed to estimate company-wide projected savings over the first ten years of the merger, as it had in its initial decision. On rehearing, the Commission adopted a Merger Savings Adjustment-based on OCC evidence and argument-it deemed more accurate than the first figure.
 
 [6]
 

 However, the Commission did not adopt the OCC position in its entirety. Instead, the Commission applied a 75% factor to the OCC figure, based on its conclusion that the figure double-counted certain labor savings. The record here contains evidence supporting the Commission's resolution of the conflicting OCC and Public Service contentions. The Commission's decision to adopt OCC's calculations with a factor to account for double counting certain labor savings is a finding of fact within the Commission's unique expertise that we do not disturb. Accordingly, we find that substantial evidence supported the Commission's decision.
 

 Public Service failed to meet its burden of showing that the Commission acted unlawfully regarding the Merger Savings Adjustment. We conclude that the Commission's decision was within its authority, was just and reasonable, and was supported by substantial evidence. We now consider the SFAS 112 Transition Adjustment.
 

 C.
 

 SFAS 112 Transition Adjustment
 

 Public Service seeks to recover in 1996, some two years after it adopted SFAS 112 and incurred the expense, a portion of the amortized transition obligation it created pursuant to its conversion from pay-as-you-go to accrual accounting under SFAS 112. Public Service argues that the SFAS 112 transition costs are legitimate expenses that it would have completely recovered had it not adopted SFAS 112 for ratemaking purposes, and accounting considerations should not foreclose its rate recovery.
 

 FASB promulgates binding accounting rules for public companies like Public Service. FASB rules do not bind the Commission for ratemaking purposes, as it enjoys plenary ratemaking authority under statute. § 40-38-1022. The Commission has demonstrated its intention to follow FASB rules as evidenced by its prior adoption of FASB rules and requirements pertaining to rate-making proceedings.
 

 The Commission did not act outside its ratemaking authority by finding that the SFAS 112 transition obligation may not be
 
 *1209
 
 deferred and amortized. See CF & I Steel, 949 P.2d at 584 (holding that "rate setting is a legislative function which involves many questions of judgment and discretion, courts will not set aside the rate methodologies chosen by the PUC unless they are inherently unsound"). The Commission's decision arises out of a plain reading of SFAS 112. SFAS 112 does not contain a provision for deferring and amortizing the transition costs. Although the Commission, in its discretion, could permit deferral and amortization of the transition obligation, it is not prohibited from adhering to FASB rules for ratemaking. See id. Accordingly, we find the Commission's decision was within its authority.
 

 The Commission found that the transition costs became legitimate period costs in January 1994, and Public Service should have sought to recover the costs then. OCC argued that if revenues were insufficient for Public Service to cover the SFAS 112 transition costs at the time the new rule became effective, it had an obligation to file for rate relief at that time. OCC pointed to company-wide profits on equity of 12.9% in 1994 and 12.8% in 1995, which were almost 2% greater than that authorized by the Commission and more than sufficient to cover SFAS 112 transition costs.
 

 The underlying purpose of changing from pay-as-you-go to accrual accounting is to conform with the matching principle. Acerual accounting for post-employment benefits ree-ognizes that post-employment costs are associated with current employment. Town of Norwood, 58 F.3d at 381. Pay-as-you-go accounting violates the matching principle, because current ratepayers are responsible for the post-employment benefits of past employees. Id. Conformance with the matching principle protects the public interest by assuring that ratepayers pay only the cost of the service they receive. Further, the Commission's decision not to allow Public Service to recover the SFAS 112 transition obligation encourages Public Service to seek rate adjustments when incurred, as Public Service can file a ratemaking case when it concludes that revenues are not sufficient to cover its costs. See § 40-8-111. Accordingly, we find the Commission's decision just and reasonable.
 

 The Commission's decision is supported by substantial evidence in the record. Public Service contends that, since the Commission permitted deferral and amortization of transition costs associated with SFAS 106, that it should also permit that here. We disagree. SFAS 106, a rule similar to SFAS 112 in that it concerns post-employment benefits and mandates employing the acerual accounting methodology, permits recovery of transition costs by three different methods. The utility provider may recover the costs as a one-time charge, amortize the cost over the working life of the existing workforce, or amortize the cost over twenty years. The Commission reasoned that the lack of a eatch-up provision in SFAS 112 meant that such costs should not be deferred and amortized. The evidence demonstrates that SFAS 112 contains no such catch-up provision.
 

 Thus we conclude that the Commission's decision is supported by substantial evidence | in the record.
 

 IIL
 

 Accordingly, we affirm the judgment of the district court upholding the decision of the Commission in this rate case.
 

 [1]
 

 . Section 40-6-115 provides that: "Appellate review may be obtained in the supreme court concerning any final judgment of the district court on review, affirming, setting aside, or modifying any decision of the commission, in the same manner and with the same effect as appellate review of judgments of the district court in other civil actions."
 

 [2]
 

 . The OCC represents the public interest before the Commission in gas, electric, and telephone matters.
 

 [3]
 

 . SFAS 71 allows a company to defer all or part of an incurred cost otherwise chargeable as an expense, when it is probable that the Commission will approve a future rate increase to cover the cost.
 

 [4]
 

 . The Commission stated in the initial order: We are persuaded that these costs became legitimate period costs concomitant with the effective date of the adoption of SFAS 112 in January 1994. Although the Commission is not bound by accounting standards issued by the Financial Accounting Standards Board or the Securities and Exchange Commission, we question whether [Public Service] could delay recovery of these costs under SFAS 71 in any event. [Public Service] argues that SFAS 112 costs are similar to SFAS 106, "Employers' Accounting for Post-retirement Benefits Other Than Pensions," costs which the Commission
 
 *1204
 
 allowed for an amortization because that accounting standard contains a "caich-up" provision; however, SFAS 112 does not include such a catch-up provision. The Commission believes that it should not create a regulatory asset for the deferred recovery of these SFAS 112 expenses. Therefore, we will accept the OCC adjustment to disallow the recovery of the amortization of the SFAS 112 costs. Consequently, we reject the Staff's proposed amortization of SFAS 112 costs.
 

 [5]
 

 . The Commission's final order on Public Service's rate requests included the following:
 

 As a result of the supplemental hearing and its rulings contained in this Decision, the Commission will revise upward the amount of the revenue change for Public Service.... The Commission finds the appropriate rate base is $605,514,424 and the appropriate net operating earnings after granting a $18,616,312 rate increase is $57,436,916.
 

 [6]
 

 . OCC's evidence included the following testimony of economist David E. Peterson:
 

 The merger represents an unprecedented opportunity for [Public Service] to significantly reduce its operating costs. I can think of no similar opportunity in the past and it is unlikely there will be similar opportunities in the future. Both the unique nature and the magnitude of the change justifies a somewhat extraordinary rate treatment for merger related costs and savings in this case. To ignore the substantial net savings that [Public Service] anticipates following the merger would result in a windfall to [Public Service's} stockholders. Ratepayers would be left paying rates that exceed [Public Service's] cost to serve.